IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,          )
                                  )
        *Plaintiff*,           )
                                  )
        *v.*                 )      Civil Action No. 1:19-cv-879 (CJN)
                                  )
UNITED STATES DEPARTMENT OF      )
JUSTICE,                        )
                                  )
        *Defendant*.          )
                                  )
                                  )
                                  )

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND...................................................... 3

I.    The FOIA Requests .......................................................................................... 3

II.   Defendant's Responses to the FOIA Requests ................................................. 3

      A.  The Criminal Division ............................................................................ 3

      B.  The Federal Bureau of Investigation....................................................... 4

      C.  The Office of Information Policy ............................................................. 4

III.  Issues Presented by This Motion ...................................................................... 5

LEGAL STANDARD.................................................................................................... 5

ARGUMENT ................................................................................................................ 6

I.    DOJ Conducted Adequate Searches. ................................................................. 5

      A.  Search Methodologies............................................................................. 7

            1.    The Criminal Division .................................................................. 7

            2.    The Federal Bureau of Investigation........................................... 10

            3.    The Office of Information Policy ................................................ 12

      B.  All Searches Were More than Adequate to Satisfy FOIA's "Reasonableness"
          Standard. ................................................................................................. 15

II.   DOJ Properly Withheld Certain Information Pursuant to Exemptions 5, 6, 7(C), and 7(E).
      .................................................................................................................... 16

      A.  CRM Properly Withheld Information under Exemption 5. ...................... 18

            1.    The Deliberative Process Privilege............................................. 18

            2.    The Attorney Work-Product Privilege......................................... 21

      B.  CRM and FBI Properly Withheld Information under Exemptions 6 and 7(C), and
          (7)(E)..................................................................................................... 22

      C.  FBI Properly Withholds Information under Exemption (7)(E). ................ 26

i

III.   CRM and FBI Processed and Released All Reasonably Segregable Information............... 28

CONCLUSION.......................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*,
   830 F.3d 667 (D.C. Cir. 2016) ............................................................... 25

*Armstrong v. Executive Office of the President*,
   97 F.3d 575 (D.C. Cir. 1996) ................................................................. 31

*August v. FBI*,
   328 F.3d 697 (D.C. Cir. 2003) ............................................................... 19

*Brayton v. Office of the U.S. Trade Representative*,
   641 F.3d 521 (D.C. Cir. 2011) ................................................................. 5

*Campbell v. DOJ*,
   164 F.3d 20 (D.C. Cir. 1998) ................................................................... 6

*Canning v. DOJ*,
   567 F. Supp. 2d 104 (D.D.C. 2008) ........................................................ 31

*Clemente v. FBI*,
   867 F.3d 111 (D.C. Cir. 2017) ............................................................... 18

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ............................................................... 21

*Comm. for Freedom of the Press v. FBI*,
   No. CV 15-1392 (RJL), --- F. Supp. 3d ---, 2020 WL 1324397 (D.D.C. Mar. 20, 2020) .. 23, 28

*Competitive Enter. Inst. v. U.S. Dep't of Treasury*,
   308 F. Supp. 3d 109 (D.D.C. 2018) ........................................................ 22

*Darui v. U.S. Dep' t of State*,
   798 F. Supp. 2d 32 (D.D.C. 2011) ......................................................... 24

*Dent v. Executive Office for U.S. Attorneys*,
   926 F. Supp. 2d 257 (D.D.C. 2013) ....................................................... 28

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
   532 U.S. 1 (2001) ................................................................................ 21

*DOJ v. Reporters Comm. for Freedom of the Press*,
   489 U.S. 749 (1989) ....................................................................... 25, 26

*Dudman Commc'ns Corp. v. Dep't of Air Force*,
  815 F.2d 1565 (D.C. Cir. 1987) .................................................................. 22

*FBI v. Abramson*,
  456 U.S. 615 (1982) ...................................................................................... 19

*Fischer v. DOJ*,
  596 F.Supp.2d 34 (D.D.C. 2009) ................................................................ 27

*Formaldehyde Inst. v. HHS*,
  889 F.2d 1118 (D.C. Cir. 1989) .................................................................. 21

*Frontier Found. v. DOJ*,
  739 F.3d 1 (D.C. Cir. 2014) ........................................................................ 23

*Greenberg v. Dep't of Treasury*,
  10 F. Supp. 2d 3 (D.D.C. 1998) .............................................................. 2, 18

*Hickman v. Taylor*,
  329 U.S. 495 (1947) ...................................................................................... 23

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) .................................................................... 23

*Iturralde v. Comptroller of Currency*,
  315 F.3d 311 (D.C. Cir. 2003) .................................................................... 18

*Jefferson v. DOJ*,
  284 F.3d 172 (D.C. Cir. 2002) .................................................................... 26

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) ...................................................................................... 19

*Judicial Watch v. Export-Import Bank*,
  108 F. Supp. 2d 19 (D.D.C. 2000) .............................................................. 21

*Judicial Watch, Inc. v. DOJ*,
  365 F.3d 1108 (D.C. Cir. 2004) .................................................................. 20

*Judicial Watch, Inc. v. HUD*,
  20 F. Supp. 3d 247 (D.D.C. 2014) ................................................................ 5

*Kowalczyk v. DOJ*,
  73 F.3d 386 (D.C. Cir. 1996) .................................................................. 6, 18

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ................................................................... 20

*Lawrence v. IRS*,
    355 F. Supp. 2d 1307 (M.D. Fla. 2004) ...................................................... 29

*Light v. DOJ*,
    968 F. Supp. 2d 11 (D.D.C. 2013) ................................................................ 5

*Long v. ICE*,
    149 F. Supp. 3d 39 (D.D.C. 2015) .............................................................. 16

*Long v. OPM*,
    692 F.3d 185 (2d Cir. 2012) ........................................................................ 27

*Mayer Brown LLP v. IRS*,
    562 F.3d 1190 (D.C. Cir. 2009) ............................................................ 29, 30

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) .................................................................... 31

*Mobley v. CIA*,
    806 F.3d 568 (D.C. Cir. 2015) ...................................................................... 6

*Nation Magazine v. U.S. Customs Serv.*,
    71 F.3d 885 (D.C. Cir. 1995) ...................................................................... 27

*Nat'l Ass'n of Crim. Def. Lawyers v. Dep' t of Just. Exec. Off. for United States Att' ys*,
    844 F.3d 246 (D.C. Cir. 2016) ............................................................... 23, 24

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
    879 F.2d 873 (D.C. Cir. 1989) .................................................................... 25

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ............................................................................... 20, 21

*Oglesby v. Dep't of the Army*,
    920 F.2d 57 (D.C. Cir. 1990) ........................................................................ 6

*Poitras v. DHS*,
    303 F. Supp. 3d 136 (D.D.C. 2018) ............................................................ 30

*Pratt v. Webster*,
    673 F.2d 408 (D.C. Cir. 1982) .................................................................... 26

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico,*
   740 F.3d 195 (D.C. Cir. 2014) ................................................................................................ 29

*Quarles v. Dep't of Navy,*
   893 F.2d 390 (D.C. Cir. 1990) ................................................................................................ 22

*Roth v. DOJ,*
   642 F.3d 1161 (D.C. Cir. 2011) .............................................................................................. 25

*SafeCard Servs. Inc. v. SEC,*
   926 F.2d 1197 (D.C. Cir. 1991) ..................................................................................... *passim*

*Schiller v. NLRB,*
   964 F.2d 1205 (D.C. Cir. 1992), *abrogated on other grounds by Milner v. Dep't of the Navy,*
   562 U.S. 562 (2011) ................................................................................................................ 23

*Schrecker v. DOJ,*
   349 F.3d 657 (D.C. Cir. 2003) ....................................................................................... *passim*

*Sea Shepherd Conservation Soc'y v. IRS,*
   208 F. Supp. 3d 58 (D.D.C. 2016) .......................................................................................... 26

*Sinito v. DOJ,*
   No. CIV.A. 87-0814 TFH, 2000 WL 36691372 (D.D.C. July 12, 2000) ................................. 28

*Skinner v. DOJ,*
   744 F. Supp. 2d 185 (D.D.C. 2010) ........................................................................................ 22

*Steinberg v. DOJ,*
   23 F.3d 548 (D.C. Cir. 1994) .................................................................................................. 18

*Sussman v. U.S. Marshals Serv.,*
   494 F.3d 1106 (D.C. Cir. 2007) .............................................................................................. 31

*U.S. Dep't of State v. Wash. Post Co.,*
   456 U.S. 595 (1982) ................................................................................................................ 25

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.,*
   No. 19-547, --- S. Ct. ---, 2021 WL 816352 (U.S. Mar. 4, 2021) ........................................... 21

*United States v. Deloitte LLP,*
   610 F.3d 129 (D.C. Cir. 2010) ................................................................................................ 24

*Weisberg v. DOJ,*
   745 F.2d 1476 (D.C. Cir. 1984) ..................................................................................... 2, 4, 18

*Wolfe v. HHS,*
   839 F.2d 768 (D.C. Cir. 1988) ............................................................... 23

*Young v. CIA,*
   972 F.2d 536 (4th Cir. 1992) ............................................................... 28

**Statutes**

5 U.S.C. § 552 ................................................................................. *passim*

28 U.S.C. § 508 ..................................................................................... 1

**Regulations**

28 C.F.R. § 0.15(a) ................................................................................. 1

**Other Authorities**

Press Release, U.S. Dep't of Justice, *Attorney General Sessions Statement on Recusal*
   (Mar. 2, 2017),
   *available at* https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal ........ 1

https://www.politico.com/story/2018/06/29/paul-manafort-storage-locker-associated-press-
   687776 .......................................................................................... 3

## INTRODUCTION

In this action filed under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Plaintiff Judicial Watch seeks records from various components of the U.S. Department of Justice ("DOJ" or "Department") related to an April 11, 2017 meeting (the "April 2017 meeting" or "meeting") between certain employees of the Department's Criminal Division ("CRM"), the Federal Bureau of Investigation ("FBI"), and reporters for the Associated Press ("AP"). The meeting occurred in the context of what was, at the time, CRM's ongoing investigation into Paul Manafort. At the meeting, certain AP journalists shared with the CRM and FBI employees in attendance (including Andrew Weissmann, who was at the time the Chief of CRM's Fraud Section) information that they had learned about Manafort in the course of their investigative reporting; however, the meeting was "off the record," in that neither the CRM nor the FBI employees provided any information of their own, or answered any questions about any pending or potential investigations. Declaration of Michael G. ("Seidel Decl.") ¶ 43. Approximately one month later, on May 17, 2017, Acting Attorney General Rod Rosenstein[1] appointed former FBI Director Robert S. Mueller III as Special Counsel, to oversee and continue the FBI's investigation into Russian interference in the 2016 U.S. presidential investigation. *See* Declaration of Jonathan M. Breyan ("Breyan Decl.") ¶ 12. Director Mueller's Special Counsel's Office ("SCO") absorbed CRM's investigation into Manafort, *id*; eventually, Manafort was

---

[1] Deputy Attorney General Rosenstein was the Acting Attorney General for these purposes because, on March 2, 2017, the Attorney General recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."  Press Release, U.S. Dep't of Justice, *Attorney General Sessions Statement on Recusal* (Mar. 2, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal. *See* 28 U.S.C. § 508; 28 C.F.R. § 0.15(a).

convicted on five tax evasion charges, one charge for failure to report foreign accounts, and two counts of bank fraud. *See* Seidel Decl. ¶ 44.

As noted, the FOIA requests at issue in this suit seek records related to the April 2017 meeting, which later received press coverage in a Politico article dated June 29, 2018. Plaintiff submitted identical requests to both DOJ (which routed the requests to CRM, in the first instance) and FBI. Although the meeting occurred prior to creation of the SCO, CRM and FBI also referred Plaintiff's requests to DOJ's Office of Information Policy ("OIP"), which has responsibility to process FOIA requests pertaining to the SCO's non-investigative files, due to the SCO's absorption of the Manafort investigation and role in Manafort's eventual prosecution. Breyan Decl. ¶¶ 1, 14-15. In the instant litigation, Plaintiff challenges only a discrete set of withholdings made on a single, two-page email thread among CRM and FBI employees, antecedent to the April 2017 meeting—as well as the adequacy of the searches conducted by each of CRM, FBI, and OIP.

As set forth below, CRM, FBI, and OIP each conducted reasonable—and indeed, quite thorough—searches of the files maintained by each respective office that were most likely to contain records responsive to Plaintiff's requests. Each component's search was appropriately tailored to its own records systems, and the "manner in which [those respective record systems] are maintained" and/or otherwise maintained, *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 30 (D.D.C. 1998), and was "reasonably calculated to uncover all relevant documents," *Weisberg v. DOJ,* 745 F.2d 1476, 1485 (D.C. Cir. 1984). Additionally, the limited withholdings to the two-page email thread challenged by Plaintiff are also well within the boundaries of the asserted FOIA Exemptions—namely Exemptions 5, 6, 7(C), and 7(E), designed to protect, respectively,

information subject to governmental privileges, the privacy interest of federal and law

enforcement personnel, and certain sensitive law enforcement information. And finally, all

reasonably segregable non-exempt material has been disclosed to Plaintiff. Accordingly, the

Court should enter summary judgment in DOJ's favor.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The FOIA Requests

By email dated July 5, 2018, Plaintiff Judicial Watch submitted the following, identical

FOIA requests to DOJ and its component agency, the FBI:

- (1) Any and all records regarding, concerning, or related to the April 2017 meeting between Department of Justice and FBI personnel and reporters, editors, and/or other individuals employed by and/ or representing the Associated Press. This request includes, but is not limited to, any and all notes, reports, memoranda, briefing materials, or other records created in preparation for, during, and/or pursuant to the meeting.

- (2) Any and all records of communication between any official, employee, or representative of [DOJ] and any of the individuals present at the aforementioned meeting.

Complaint ("Compl."), Dkt. No. 1, ¶ 6. Plaintiff's requests further stated that, "[f]or purposes of

clarification, the meeting that is the subject of his request was reported on by Politico on June 29,

2018," and provided a hyperlink to a Politico news article entitled "Associated Press May Have

Led FBI to Manafort Storage Locker." *Id*; *see* https://www.politico.com/story/2018/06/29/paul-

manafort-storage-locker-associated-press-687776 ("Politico article").

### II.     Defendant's Responses to the FOIA Requests

#### A.     The Criminal Division

Plaintiff's requests directed to DOJ were, in the first instance, routed to CRM.

Declaration of Courtney J. O'Keefe ("O'Keefe Decl.") ¶ 7. CRM conducted a thorough search,

involving three CRM sections—the Office of the Assistant Attorney General ("OAAG"), the Money Laundering and Asset Recovery Section ("MLARS"), and the Fraud Section ("Fraud"), using methods which were reasonably tailored to produce the information requests. *See* O'Keefe Decl. ¶¶ 13-27. Ultimately, CRM produced 351 pages in part, and withheld 54 pages in full. *Id.* ¶ 28 & n.9.

### B.      The Federal Bureau of Investigation

As noted above, Plaintiff submitted identical FOIA requests to FBI, simultaneously with its submission to DOJ. Compl. ¶ 6. The FBI likewise conducted thorough and reasonable searches of its relevant files and computer systems, and located and processed 28 pages of responsive FBI records. *See* Seidel Decl. ¶¶ 4, 11-40

The FBI also reviewed 59 pages of responsive records located by CRM, and referred by CRM to FBI for consultation. *Id.* ¶ 5. Those 59 pages include the two-page email thread challenged by Plaintiff here, as to which FBI requested withholdings, consistent with the terms of the FOIA, to protect its equities. *Id.*

### C.      The Office of Information Policy

On July 2, 2019, after the instant litigation had already commenced, the FBI and CRM referred Plaintiff's FOIA request to OIP for additional searches and processing. Breyan Decl. ¶ 5. As further detailed below, OIP conducted several searches that were reasonably calculated to uncover any relevant documents; however, these efforts did not yield any responsive records. *See id.* ¶¶ 25-32.

4

### III.    Issues Presented by This Motion

By email dated November 3, 2020, Plaintiff's counsel informed defense counsel that Plaintiff is challenging the adequacy of all three DOJ component's searches. Defendant's Exhibit ("DEX") 1 p. 2.

Two days later, in the course of the same email exchange, Plaintiff's counsel further informed defense counsel that Plaintiff would additionally challenge the propriety of all withholdings on two pages of CRM's production, CRM-029 and CRM-030, which constitute an email thread antecedent to the April 2017 meeting. *Id.* p. 1; O'Keefe Decl. Exhibit C (the email thread in question, containing the challenged redactions). As set forth below, the withholdings on CRM-029-030 were made by both CRM and FBI.

### LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Judicial Watch, Inc. v. HUD*, 20 F. Supp. 3d 247, 253 (D.D.C. 2014) (citation omitted); *see also Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011) ("[T]he vast majority of FOIA cases can be resolved on summary judgment."). A court reviews an agency's response to a FOIA request *de novo.* 5 U.S.C. § 552(a)(4)(B). "The defendant in a FOIA case must show that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Light v. DOJ*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013).

# ARGUMENT

## I.      DOJ Conducted Adequate Searches.

To show that it has conducted an adequate search for responsive records, a defendant must show "a good faith effort to [] search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The touchstone of the analysis is the reasonableness of the search, not the records produced. *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015). An agency may exercise discretion in crafting its search to meet this standard, and does not have to search every system if additional searches are unlikely to produce any marginal return. *See Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998). Searching for records requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and is "hardly an area in which the courts should attempt to micro-manage the executive branch." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003). If, during such a targeted search, the agency uncovers "a lead [that] it cannot in good faith ignore, *i.e.,* a lead that is both clear and certain" regarding the existence of additional responsive records in another, unsearched location, the agency must pursue that lead. *Kowalczyk v. DOJ,* 73 F.3d 386, 389 (D.C. Cir. 1996). But otherwise, having reached the end of a reasonably designed search for responsive records, the agency may conclude the search and proceed to processing and disclosure of non-exempt information within the responsive records identified in the search. *Id.*

To prove the reasonableness of its search, an agency can submit a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920

F.2d at 68. Agency declarations enjoy "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (citation omitted).

As explained below, CRM, the FBI, and OIP each conducted searches that amply satisfy the reasonableness standard under FOIA.

### A.     Search Methodologies

#### 1.     The Criminal Division

Prior to receipt of Plaintiff's requests, the Criminal Division had received a separate request seeking records concerning the April 2017 meeting which identified Andrew Weissmann, former Chief of the Fraud Section of the Criminal Division, as an individual who attended the meeting. *Id.* ¶ 13. Thus, the CRM FOIA/Privacy Act ("FOIA/PA") Unit was aware that the Fraud Section potentially maintained responsive records. *Id.* Additionally, because of the media interest surrounding the April 2017 meeting and its relation to the work of the SCO, the FOIA/PA Unit had notified the Office of the Assistant Attorney General (OAAG) when the first request was received, and indicated that it would provide a request to OAAG to conduct a search for responsive records. *Id.* At that time, OAAG further identified the Money Laundering and Asset Recovery Section (MLARS) as another office within the Criminal Division that might have potentially responsive records. *Id.*

The FOIA/PA Unit sent search requests to OAAG, MLARS, and the Fraud Section. *Id.* ¶ 15. In response, OAAG advised that it was possible that there existed potentially responsive records, for which OAAG requested the FOIA/PA Unit conduct an electronic search. *Id.* ¶ 16. Based upon OAAG's understanding of the underlying subject of the FOIA request, OAAG

identified potential custodians of responsive records: Andrew Weissmann; Bruce Swartz, a

Deputy Assistant Attorney General for the Criminal Division; Kendall Day, a former Acting

Deputy Assistant Attorney General for the Criminal Division; and Ann Brickley, an MLARS

trial attorney. *Id.*

 MLARS provided the FOIA/PA Unit with a set of Ann Brickley's emails believed to be

responsive to the request.[2] *Id.* ¶ 17. After discussions with Ms. Brickley and a review of her

provided emails, the following individuals (in additional to those identified above) were

identified as having sent or received emails  regarding the April 2017 meeting: Deborah Connor,

the Chief of MLARS; Mary Butler, the Chief of MLARS' International Unit; and Bruce Ohr, of

the Office of the Deputy Attorney General. *Id.* Additionally, Ms. Brickley confirmed that she did

not possess any hard copy records responsive to Plaintiff's request. *Id.*

 An electronic search of the email accounts of these custodians was then conducted (that

is, Andrew Weissmann, Bruce Swartz, Kendall Day, Bruce Ohr, Deborah Connor, Mary Butler,

and Ann Brickley), as well as of MLARS's electronic shared drives. *Id.* ¶ 20. The search terms

were "AP" with "meeting"; "Associated Press" with "meeting"; "Eric Tucker," Jeff Horwitz,"

"Ted Bridis," "Jack Gillum," (ie, the names of the AP reporters present at the April 2017

meeting), and "etucker@ap.org," "jhorwitz@ap.org," or tbridis@ap.org.[3] The date range for the

---

[2]  During the course of determining appropriate records searches regarding Plaintiff's FOIA
request, the FOIA/PA Unit became aware that Ann Brickley attended the April 2017 meeting. *Id.*
¶ 17 n.2.

[3] Ann Brickley's emails provided the reporters' names and contained the email addresses of the
Tucker, Horwitz, and Bridis, but not Gillum. *Id.* ¶ 20 n.4.

search was March 1 through June 30, 2017 (*i.e.*, from more than five weeks prior the meeting, to approximately seven weeks after its occurrence) *Id.* ¶¶ 19.

The FOIA/PA Unit reviewed the records returned from the first electronic search and determined that supplemental records searches of the following additional custodians who appeared in these records were necessary: Kenneth Blanco, formerly the Acting Assistant Attorney General of the Criminal Division; James Mann, formerly the Chief of Staff of OAAG; and, Trevor McFadden, formerly a Deputy Assistant Attorney General of OAAG. *Id.* ¶ 20. These custodians' email accounts were searched using the following search terms: "AP" with "meeting;" "Eric Tucker;" "Jeff Horwitz;" "Ted Bridis;" or "Jack Gillum." *Id.* ¶ 22-23.

The review of the first electronic records search independently revealed that certain custodians—namely the same three custodians listed in the preceding paragraph, as well as Kendall Day—were communicating with the Federal Bureau of Investigation and DOJ's Office of Public Affairs regarding the April 2017 meeting. *Id.* ¶ 24. Accordingly, a separate electronic records search of those custodians (Day, Blanco, Mann, and McFadden) was independently conducted, using the following search terms: siflores@usdoj.gov (*i.e.*, email address of Sarah Flores, the former Department spokesperson and head of the Department's Office of Public Affairs), and the email address of a non-public facing FBI employee who worked in the FBI's Office of Public Affairs. *Id.*

Following completion of these additional searches, the FOIA/PA Unit conducted a responsiveness review and processed all responsive documents for segregable release to Plaintiff. *Id.* ¶ 25.

9

2.      **The Federal Bureau of Investigation**

In response to a typical FOIA request, the FBI ordinarily conducts an index search of its

Central Records System ("CRS"). Seidel Decl. ¶ 11. While the FBI eventually conducted such a

search here, because Plaintiff's request sought information about a specific meeting—which is

not the type of information typically indexed within the CRS—FBI began its search by

identifying an FBI Special Agent ("SA") (for purposes of this memorandum, the "FBI SA")[4]

who attended the April 2017 meeting, and requesting that he search for records responsive to

Plaintiff's request. *Id.* ¶ 12. In response to this tasking, the FBI SA searched his email archives

using a combination of search terms "FBI," "DOJ," and/or "AP April 2017 meeting," but did not

locate any responsive emails relating to the meeting with the AP. *Id.* ¶ 15. Additionally, the FBI

SA separately searched his computer hard drives using the same search terms, as well as his

paper files for any additional documents that could be responsive to Plaintiff's FOIA request;

these additional searches also did not locate any responsive records. *Id.*

Even though the then FBI SA did not have any specific records still in his possession

concerning the meeting, he did, however, recall taking handwritten notes during the meeting, and

creating an electronic communication ("EC") (*i.e.*, an internal FBI memorandum) in May 2017

memorializing the meeting. *Id.* ¶ 16. He further recalled that he had "serialized," or added, each

of these documents within the FBI's CRS file for its Manafort investigation.[5] *Id.* Finally, the FBI

---

[4] The FBI SA's identity is among those withheld under Exemption 6 and 7(C), *see infra.*
However, all references in the instant section discussing the FBI's searches is to this same
individual.

[5] Within each case file, pertinent documents of interest are "serialized," or assigned a document
number in the order in which the document is added to the file, typically in chronological order.
Seidel Decl. ¶ 19.

SA informed RIDS that any additional records concerning other FBI personal attending the meeting would also be maintained as part of both the FBI's Paul Manafort investigative case file in the CRS, and also as part of the SCO case files that are separately maintained within the CRS. *Id.*

With the benefit of this information, FBI was able to initiate a search for responsive records within its CRS. *Id.* ¶ 27. Specifically, FBI conducted a CRS index search for potentially responsive records, employing the search terms "Associated Press" and "AP meeting." *Id.* FBI assessed that 28 pages of these search results—including the FBI SA's own EC and handwritten notes, as well as other ECs and notes created by other FBI personnel who had attended the meeting—are responsive to Plaintiff's requests. *Id.* FBI then processed these 28 pages for segregable release to Plaintiff. *Id.*

Finally, out of an abundance of caution, FBI further conducted a search of the SCO investigatory files that are separately maintained within the CRS, using the same search terms: "Associated Press", and "AP meeting." *Id.* ¶ 28. Through this additional search, RIDS confirmed that (as it expected, given the structure of the CRS), the only responsive documents in the SCO investigatory files were the same ones that had already been processed and released to Plaintiff. *Id.*

The FBI conducted one additional search. Around approximately the same time as FBI was conducting the above-described searches in response to Plaintiff's requests, it received a separate administrative FOIA request, from a different requester, for "records concerning the issuance of a complaint about the March or April 2017 meeting involving Justice and FBI officials with reporters from the Associated Press." *Id.* ¶ 31. The purported existence of such a

"complaint" was alleged in a court filing made by an attorney for Manafort, filed on May 21, 2018. *See* 18-CR-00083-TSE (E.D.V.A.), Dkt. No. 77, p. 6. Although Plaintiff did not specifically seek a copy of this alleged complaint, FBI assessed that, if it existed, it would be responsive to Plaintiff's FOIA requests; accordingly, the FBI asked its Office of Public Affairs ("OPA") to search for records concerning the filing of an alleged FBI complaint with DOJ over the procedures followed for dealing with journalists at the April 2017 meeting. Seidel Dec. ¶ 31. OPA searched both its unclassified and classified email systems, using the following search terms: "FBI Complaint," "Associated Press," "AP/DOJ Meeting," and "April 2017," but did not locate any responsive records. *Id*. ¶ 33. OPA further suggested that FBI's Criminal Investigative Division ("CID"), International Corruption Unit ("ICU"), would be the most likely FBI Division and Office to have responsive records, if any exist. *Id*.

After receiving this response, FBI further reached out to CID-ICU, with the same request. *Id*. ¶ 34. CID-ICU searched its electronic record file systems, using the following search terms: "FBI Complaint," "Associated Press," "AP/DOJ Meeting," and "April 2017." *Id*. ¶ 35. In addition, a Supervisor Special Agent ("SSA") of ICU spoke with current and former personnel who attended the April 11, 2017 meeting, or were familiar with the details of the meeting, but these conversations did not yield any additional information about the existence of any responsive records. *Id*. ¶¶ 35-36. Thus, CID-ICU's searches likewise did not yield any responsive records. *Id*.

### 3.     The Office of Information Policy

As explained above, CRM and FBI referred Plaintiff's FOIA requests to OIP in July 2019, after the instant litigation had commenced. Breyan Decl. ¶ 5. The referral was made to

ensure the adequacy of DOJ's search: although FBI's CRS maintains the *investigative* files of the SCO, DOJ's Justice Management Division ("JMD") is responsible for maintaining—and OIP is responsible for processing FOIA requests seeking—the non-investigative SCO records collection. *Id.* ¶¶ 14-15.

In response to this referral, OIP conducted three searches: a targeted, but comprehensive, search of the email accounts of each the only two eventual SCO employees who were present at the April 2017 meeting; and two separate targeted, manual searches. For the first of these searches (the email search), OIP used responsive documents that had already been located and processed by FBI to identify the only two attendees of the April 2017 meeting who went on to work for the SCO: attorney Andrew Weissmann, and one additional FBI employee.[6] *Id.* ¶ 26. OIP then searched these two employees' email accounts using the date range of May 18, 2017 (the date on which the unnamed FBI detailee began his work at SCO; Mr. Weissmann began his detail on June 2, 2017) through October 11, 2017 (six full months after the meeting). *Id.* OIP used the following search strings ("Associated Press" AND "locker") and ("AP" AND "locker"), as the meeting participants had allegedly discussed a storage locker owned by Manafort. *Id.*; *see also* Politico article. This search did not identify any records responsive to Plaintiff's requests. Breyan Decl. ¶ 26.

The first manual search was of the SCO's electronic files. Specifically, the Politico article also included information about a binder used at a hearing in the prosecution of Paul Manafort, which, according to the article, contained "statements about the April 2017 meeting." *Id.* ¶ 27; *see* Politico article. Because SCO was involved in this prosecution, OIP assessed that this binder

---

[6] The identity of this FBI SA is protected pursuant to Exemptions 6 and 7(C), *see infra*.

might have contained responsive materials created "pursuant to the meeting." Breyan Decl. ¶ 27. However, at the time when OIP received Plaintiff's requests, and conducted the initial searches described herein (*i.e.*, between July 2, 2019 and February 6, 2020), it simply was not possible to conduct a search of the SCO's paper records. *Id.* ¶¶ 11, 17-21, 30. After the SCO's conclusion in March 2019, SCO archived its papers records in approximately 180 banker's boxes and transferred them to JMD for records management. *Id.* ¶¶ 13-15. However, during the relevant window of time when OIP conducted its initial searches, these boxes were not indexed in any manner, *id.* ¶ 30—thus placing any physical paper records search well outside of the requirements of the FOIA. *Cf. Long v. ICE*, 149 F. Supp. 3d 39, 55 (D.D.C. 2015) ("[A]gencies need not disclose records when conducting a search for requested materials would impose an unreasonable burden."); *Schrecker*, 349 F.3d at 664 ("There are limits to the lengths to which an agency must go in responding to a FOIA request.").

Accordingly, since a paper records search was neither reasonable nor feasible at this point in time OIP instead endeavored to determine if electronic copies of the hard-copy documents contained in the binder existed, and could be located within the SCO's electronic files. Breyan Decl. ¶¶ 28-29. Because the extraordinary volume of the SCO records collection housed by JMD precludes the conduct of any across-the-board search of this records set, *see generally id.* ¶¶ 17-21, OIP used information provided by an Assistant United States Attorney involved in the Manafort prosecution to assess where, if anywhere in the SCO records collection, the electronic files corresponding to the physical contents of this binder might be located. *Id.* ¶ 28. Based on this consultation, as well its own familiarity with JMD's electronic SCO files, OIP identified electronic folders within the SCO electronic records collection that related to the Manafort trial,

and reviewed the files contained within those folders. *Id.* ¶ 29. This search likewise failed to yield either any documents corresponding to those contained in the binder referenced by the Politico article, or any other responsive documents. *Id.*

Finally, in December 2020, OIP conducted a supplemental manual—and again targeted—search of the SCO's paper files. *Id.* ¶ 31. As described in detail in the Breyan Declaration, OIP had been unable to search these records during the period in which it conducted its initial searches, because at that time the SCO's paper records—which were then, and are still, maintained in approximately 180 banker's boxes—had not been indexed in any manner. *Id.* ¶ 30. However, in the fall of 2020, during the course of the parties' conferral regarding Defendant's response to Plaintiff's FOIA request, OIP learned that JMD had—in the interim since OIP's original electronic searches described above—created "box lists," *i.e.*, lists of the subjects of the records contained in each respective box. *Id.* Accordingly, OIP reviewed the box lists and identified one box that could potentially maintain records created "in preparation for, during, and/or pursuant to" the April 2017 meeting. *Id.* ¶ 31. Specifically, one of the "box lists" corresponding to a particular banker's box contained, among many other identified subjects corresponding to records contained in that box, an itemization for "Manafort Trial Binder: Locker Search SW Witness." *Id.* OIP manually reviewed, page-by-page, the paper files contained in that box but did not find any such binder or other responsive records. *Id.*

### B.      All Searches Were More than Adequate to Satisfy FOIA's "Reasonableness" Standard.

Each of the searches described in detail above, and in the agency declarations that accompany this memorandum, easily satisfies the relevant "reasonableness" standard under the FOIA. *See*, *e.g.*, *Clemente v. FBI*, 867 F.3d 111, 117 (D.C. Cir. 2017) (An agency is entitled to

summary judgment in a FOIA case with respect to the adequacy of its search if it shows "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.") (citation omitted); *Weisberg*, 745 F.2d at 1485 ("[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*.") (citation omitted). Each component's search was appropriately tailored to its own records systems, and the manner in which those respective record systems are indexed and/or otherwise maintained, *see Greenberg*, 10 F. Supp. 2d at 30, and thus employed "both systemic and case-specific exercises of discretion and administrative judgment and expertise," *Schrecker*, 349 F.3d at 662. All reasonable leads were followed, *cf. Kowalczyk*, 73 F.3d at 389, and each component's exercise of judgment in following such leads to their logical conclusions is entitled to "a presumption of good faith." *SafeCard Servs. Inc.*, 926 F.2d at 1201. Under these well-established standards, DOJ has amply satisfied its burden to conduct a reasonable search for responsive records. *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (the adequacy of a FOIA search is determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search); *Steinberg v. DOJ,* 23 F.3d 548, 551 (D.C. Cir. 1994) (similar).

## II.    DOJ Properly Withheld Certain Information Pursuant to Exemptions 5, 6, 7(C), and 7(E).

The Court should also find that DOJ properly withheld certain information from the two-page email thread, marked as document number CRM-029-030, pursuant to FOIA's Exemptions 5, 6, 7(C), and 7(E).

The FOIA represents a balance struck by Congress "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982). Although FOIA "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency*, 493 U.S. at 152). Accordingly, the exemptions must be given "meaningful reach and application" in order to achieve the "workable balance" that Congress has struck "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency*, 493 U.S. at 152 (citations omitted). The agency bears the burden of justifying the withholding of material responsive to a FOIA request, and a court reviews the agency's response to the request *de novo*. 5 U.S.C. § 552(a)(4)(B).

A court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). This is not a high bar: "[u]ltimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.*

17

As explained above, Plaintiff challenges only the withholdings on two pages of CRM's production, CRM-029 and CRM-030. DEX 1. These pages constitute an email thread antecedent to the April 2017 meeting, which CRM produced in part, but from which CRM withheld certain discrete pieces of information pursuant to Exemption 5 (on behalf of itself), and well as Exemptions 6 and 7(C) (on behalf of itself and FBI). O'Keefe Decl. Ex. C (the email thread in question, containing the challenged redactions). As set forth below, each of the challenged withholdings is proper.

## A.     CRM Properly Withheld Information under Exemption 5.

Exemption 5 of FOIA protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption incorporates the privileges available to Government agencies in civil litigation, including the deliberative process privilege, attorney-client privilege, and attorney work-product privilege. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *see Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1113 (D.C. Cir. 2004). Two of these privileges—the deliberative process privilege, and the attorney work-product privilege—are relevant here.

### 1.     The Deliberative Process Privilege

First, responsive information was properly withheld from CRM-029 on the basis of the deliberative process privilege. "To protect agencies from being forced to operate in a fishbowl, the deliberative process privilege shields from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *U.S. Fish & Wildlife Serv. v. Sierra Club,*

*Inc.*, No. 19-547, --- S. Ct. ---, 2021 WL 816352, at *4 (U.S. Mar. 4, 2021) (internal citations omitted). The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance ' the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (quoting *Sears, Roebuck & Co.*, 421 U.S. at 151). To come within the scope of the deliberative process privilege, a document must be both predecisional and deliberative. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

A document is predecisional if "it was generated before the adoption of an agency policy," and it is deliberative if "it reflects the give-and-take of the consultative process." *Id.* "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1223 (D.C. Cir. 1989)). The privilege therefore applies broadly to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866. Finally, courts should afford "considerable deference to the agency's judgment as to what constitutes . . . part of the agency give-and-take—of the deliberative process—by which the decision itself is made." *Competitive Enter. Inst. v. U.S. Dep't of Treasury*, 308 F. Supp. 3d 109, 117 (D.D.C. 2018) (citation omitted). "The key question" in identifying deliberative material is "whether disclosure

19

of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency[.]" *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987).

The information withheld pursuant this privilege—"portions of an email discussion among Criminal Division attorneys while conducting a then-ongoing criminal investigation," O'Keefe Decl. ¶ 37—easily satisfies these standards. The discussion is plainly pre-decisional, in that it preceded both the conclusion of the investigation, and also the Criminal Division's determinations about how to best conduct the meeting in question. It also deliberative: as described further by the O'Keefe Declaration, the redacted conversation reflects the exchange of ideas, opinions, and recommendations among Criminal Division attorneys regarding how best to conduct "an upcoming meeting with a third party in the broader context of a then-ongoing criminal investigation." *Id.* ¶ 38. Disclosure of such information—which is to say, of strategic deliberations regarding the conduct of an ongoing investigation—would, thus, expose these attorneys' "decision-making process in such a way as to discourage candid discussion within the [Criminal Division] and thereby undermine the agency's ability to perform its functions." *Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990)); *see also*, *e.g.*, *Skinner v. DOJ*, 744 F. Supp. 2d 185, 205-06 (D.D.C. 2010) (protecting emails between ATF agents and attorneys discussing investigatory strategy in an ongoing criminal investigation, as release "would inhibit the candid, internal discussion necessary for efficient and proper litigation preparation"); *Reps. Comm. for Freedom of the Press v. FBI*, No. CV 15-1392 (RJL), --- F. Supp. 3d ---, 2020 WL 1324397, at *8 (D.D.C. Mar. 20, 2020), *appeal filed*, Dkt. No. 20-5091 (holding that the deliberative process privilege properly encompassed emails between FBI

attorneys and other FBI personnel, "discussing matters pertaining to the application of an investigative technique").

Finally, the deliberative process privilege also protects factual material that is "inextricably intertwined" with deliberative material. *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 13 (D.C. Cir. 2014) (quoting *In re Sealed Case,* 121 F.3d 729, 737 (D.C. Cir. 1997)); *see also*, *e.g.*, *Wolfe v. HHS,* 839 F.2d 768, 774 (D.C. Cir. 1988) (explaining that where "material that could be characterized as 'factual' would so expose the deliberative process … it must be covered by the privilege"). Accordingly, insofar as the withheld portions of the emails in question reflect facts selected or cited by the Criminal Division attorneys as relevant to their strategic deliberations, such facts are inextricably intertwined with the deliberation itself, and are likewise properly protected by the privilege. *See* O'Keefe Decl. ¶ 40.

## 2.   **The Attorney Work-Product Privilege**

Independently, the information withheld pursuant to Exemption 5 is also protected by the attorney work-product privilege, which protects documents and other written materials prepared by an attorney in contemplation of litigation, *see Hickman v. Taylor*, 329 U.S. 495, 509-10 (1947), including criminal prosecutions, *Nat'l Ass'n of Crim. Def. Lawyers v. Dep' t of Just. Exec. Off. for United States Att' ys*, 844 F.3d 246, 251 (D.C. Cir. 2016). The privilege "extends to documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated" at the time of the document's creation. *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992), *abrogated on other grounds by Milner v. Dep't of the Navy*, 562 U.S. 562 (2011). In assessing whether a document was prepared in anticipation of litigation, the test is "whether, in light of the nature of the document and the factual situation in the particular case,

the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010). For that standard to be met, the attorney who created the document must have "had a subjective belief that litigation was a real possibility," and that subjective belief must have been "objectively reasonable." *Nat' l Ass' n of Crim. Def. Lawyers*, 844 F.3d at 251 (internal citation omitted).

The information withheld under Exemption 5 satisfies these standards as well, where it reflects a discussion among DOJ attorneys related to a then-ongoing criminal law enforcement investigation, O'Keefe Decl. ¶ 37, that ultimately resulted in a criminal indictment, trial, and conviction on a portion of the charged crimes. *See SafeCard Servs., Inc.*, 926 F.2d at 1203 ("[W]here an attorney prepares a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party, it has litigation sufficiently ' in mind' for that document to qualify as attorney work product."); *Darui v. U.S. Dep' t of State*, 798 F. Supp. 2d 32, 39 (D.D.C. 2011) (emails "prepared by attorneys for DOJ and State … in connection with a law enforcement proceeding" were protected by the work-product privilege).

Accordingly, the Court should uphold CRM's withholdings to the challenged email thread made pursuant to Exemption 5.

**B.**     **CRM and FBI Properly Withheld Information under Exemptions 6 and 7(C), and (7)(E).**

Additional redactions to CRM-029-030 made pursuant to Exemptions 6 and 7(C) in order to protect the privacy interests of CRM and FBI employees should also be upheld.

Exemption 6 protects "personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(6). "Exemption 6 is designed to protect personal information in public records, even if it

22

is not embarrassing or of an intimate nature[.]" *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989) (citing *U.S. Dep't of State v. Wash. Post Co.,* 456 U.S. 595, 600 (1982)). Similarly, Exemption 7(C) protects "information compiled for law enforcement purposes" to the extent it "could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(7)(C). "Exemption 7(C), which requires the government to prove only that disclosure 'could reasonably be expected to constitute an unwarranted invasion of personal privacy,' is 'somewhat broader' than Exemption 6, which requires proof of a 'clearly unwarranted invasion of personal privacy.'" *Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (quoting *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989)).

Where the information in question "was ' compiled for law enforcement purposes,' thus implicating Exemption 7(C), courts "have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Id.* However, and in any event, under both Exemption 6 and Exemption 7(C), the Court must engage in a balancing test to determine whether the public interest in disclosure is outweighed by a significant private interest in non-disclosure. *See Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 673-74 (D.C. Cir. 2016).[7]

---

[7] Further, Defendant notes that—although the relevant analysis in this case is made under Exemption 7(C)—the Supreme Court has also adopted a broad construction of the privacy interests protected by Exemption 6, emphasizing that "privacy encompass[es] the individual's control of information concerning his or her person." *Reps. Comm.*, 489 U.S. at 764 n. 16 (citation omitted).

With respect to the threshold requirement that a record have been "compiled for law enforcement purposes," the D.C. Circuit "has long emphasized that the focus is on how and under what circumstances the requested files were compiled . . . and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'" *Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d 58, 79 (D.D.C. 2016) (quoting *Jefferson v. DOJ*, 284 F.3d 172, 177 (D.C. Cir. 2002)) (additional citations omitted); *see also Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982) (noting that in assessing whether an agency record satisfies this requirement, a court can properly accept "less exacting proof from . . . a [law enforcement] agency that the purpose underlying disputed documents is law enforcement," on the ground that where an agency has a law enforcement mission, judicial deference to the agency's characterization of its own records is appropriate). Here, the email thread in question was "compiled for law enforcement purposes," thus satisfying the threshold requirement for Exemption 7(C). Specifically, this email thread was created (and thus compiled) in the course, and in furtherance, of the then-ongoing criminal investigation into Paul Manafort. O'Keefe Decl. ¶ 37; Seidel Decl. ¶¶ 43-44. Accordingly, these records were compiled for a law enforcement purpose squarely within the meaning of Exemption 7(C).

Turning to the relevant balancing test, "[o]n the privacy side of the ledger, [courts] have consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including *investigators*, suspects, witnesses, and informants." *Schrecker v. DOJ,* 349 F.3d at 661; *see also, e.g., Fischer v. DOJ,* 596 F.Supp.2d 34, 47 (D.D.C. 2009). Such information is "categorically exempt" from disclosure under Exemption 7(C) in the absence of an overriding public interest in its disclosure. *Nation Magazine*

*v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995). In analyzing the public's interest, the inquiry "should focus not on the general public interest in the subject matter of the FOIA request, but rather on the incremental value of the specific information being withheld." *Schrecker*, 349 F.3d at 661.

   CRM and FBI properly applied these principles to withhold under Exemption 6 and 7(C) two categories of information in records responsive to Plaintiff's requests: (1) the names of non-public facing CRM and FBI attorneys and SAs, and (2) their corresponding contact information, including email addresses, and office and mobile phone numbers. As both the O'Keefe and Seidel Declarations explain, public disclosure of such information would put CRM and FBI attorneys and SAs at serious risk of harassment and unwanted publicity—especially given the very high-profile nature of the Manafort and SCO investigations and prosecutions. O'Keefe Decl. ¶ 47; Seidel Decl. ¶ 49. Such inquiries or harassment could disrupt and impede CRM and FBI official activities, and/or result in unwanted or even unlawful efforts to gain additional access to these individuals and/or personal information about them. O'Keefe Decl. ¶ 47; Seidel Decl. ¶ 49. *See, e.g.*, *Long v. OPM*, 692 F.3d 185, 192 (2d Cir. 2012) (noting that "[i]t is not uncommon for courts to recognize a privacy interest in a federal employee's work status . . . if the occupation alone could subject the employee to harassment or attack. Courts have recognized, for example, a privacy interest in the names of . . . law enforcement agents who participated in an investigation.") (citations omitted). In contrast, disclosure of this information would not materially advance the public's understanding of the operations or activities (including with respect to the Manafort investigation and prosecution in particular) of either CRM or the FBI. O'Keefe Decl. ¶ 48; Seidel Decl. ¶ 50. Accordingly, the Court should uphold CRM and

FBI's determination that the privacy interests at stake outweigh any public interest in disclosure. *See, e.g.*, *Reps. Comm. for Freedom of the Press*, 2020 WL 1324397, at \*9 (upholding the withholding identifying information as to certain FBI employees on the ground that disclosure would subject them unwanted "attention" and "targeting"); *Dent v. Executive Office for U.S. Attorneys*, 926 F. Supp. 2d 257, 269 (D.D.C. 2013) (similar).

### C.    FBI Properly Withholds Information under Exemption (7)(E).

Finally, FBI asserts Exemption 7(E) over one last piece of information—"a sensitive internal FBI email address on CRM Bates page CRM-029, which was created and authorized for internal use by the FBI," Seidel Decl. ¶ 52; the information appears in the third line from the bottom of page CRM-029, directly above "Subject: Re: meeting with Andrew Weissman." Although 7(E) is not among the exemptions asserted in the version of CRM-029 that was produced to Plaintiff, FOIA clearly directs courts to review agency actions *de novo. See* 5 U.S.C. 552(a)(4)(B). Accordingly, as courts consistently recognize, "an agency is not barred from invoking a particular exemption in litigation merely because that exemption was not cited in responding to the request at the administrative level." *Sinito v. DOJ*, No. CIV.A. 87-0814 TFH, 2000 WL 36691372, at \*16 (D.D.C. July 12, 2000); *see also*, *e.g.*, *Young v. CIA*, 972 F.2d 536, 538-39 (4th Cir. 1992); ("[A]n agency does not waive FOIA exemptions by not raising them during the administrative process."); *Lawrence v. IRS*, 355 F. Supp. 2d 1307, 1310 (M.D. Fla. 2004) (similar). Accordingly, FBI withholds the information in question by asserting Exemption 7(E) over it through the Seidel Declaration, *see* Seidel Decl. ¶¶ 51-54, and the instant memorandum.

To withhold information pursuant to Exemption 7(E), an agency must demonstrate that release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions," or would "disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).[8] As the D.C. Circuit has recognized, "the text of [E]xemption 7(E) is much broader" than other exemptions that "set a high[er] standard." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009). "Rather than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the [agency] 'demonstrate[] logically how the release of [the requested] information might create a risk of circumvention of the law." *Id.* (citation omitted). Thus, Exemption 7(E) "exempts from disclosure information that could *increase the risks* that a law will be violated or that past violators will escape legal consequences." *Id.* at 1193.

The internal email address at issue easily satisfies these standards.[9] As explained by the Seidel Declaration, the FBI protects, as a matter of course, its "internal email naming

---

[8] Courts within the D.C. Circuit and elsewhere are divided as to whether the phrase "if such disclosure could reasonably be expected to risk circumvention of the law" applies only to "guidelines" or also applies to "techniques and procedures." *See Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 204 (D.C. Cir. 2014). Although the better-reasoned decisions recognize that the former interpretation is more consistent with the plain meaning of the statute and the history of the 1986 amendments to Exemption 7(E), the Court need not reach the issue, as the "low bar" of this additional showing is met here. *See id.*; Seidel Decl. ¶ 54.

[9] Initially, for the same reasons given above, this information satisfies the threshold requirement of all Exemption 7 subparts by appearing in a document that was compiled for law enforcement purposes; additionally, the protected email was itself "created and authorized for internal use by the FBI," Seidel Decl. ¶ 52, which is itself a purpose in furtherance of the FBI's law enforcement mission.

convention," as "[r]elease of this type of information could allow individuals under investigation to exploit the FBI's information technology ("IT") system to gain unauthorized access to, view and manipulate data on, or otherwise interfere with the FBI's non-public intranet." Seidel Decl. ¶ 54. Additionally, the publication of this information could allow bad actors to disrupt FBI's law enforcement operations by subjecting FBI employees to harassing e-mails seeking information concerning FBI investigations. *Id.*; *see also, e.g.*, *Poitras v. DHS*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (affirming the withholding, under Exemption 7(E), of "protected internal e-mail addresses, non-public intranet web addresses, and a secure internal e-mail tool," because disclosure would increase risk of unauthorized access to the agency's IT system). Finally, as discussed *supra*, the names of most FBI SAs are protected from disclosure under FOIA. Because the majority of FBI internal e-mail addresses include at least part of the person's name, the release of the protected email address would simultaneously release its holder's name (or a majority of the name), which has been withheld for the reasons explained *supra* in Section II.B.

For all of these reasons, the Court should uphold the FBI's additional Exemption 7(E) assertion over the email address in question.

### III.   CRM and FBI Processed and Released All Reasonably Segregable Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b)(9). However, non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with

'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. DOJ*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Here, in evaluating CRM-029-030, CRM and FBI conducted a line-by-line review and released all reasonably segregable non-exempt information. O'Keefe Decl. ¶¶ 50; Seidel Decl. ¶ 55. For same reasons stated *supra*, with respect to the discrete blocks of information withheld under Exemption 5, CRM determined that, to the extent there is any factual material therein, it is part and parcel of the protected deliberation and cannot be segregated. *See* O'Keefe Decl. ¶ 41. Specifically, any facts referenced by Criminal Division attorneys within the challenged discussion were done so for their relevance to the strategic deliberations; any such, these facts are inextricably intertwined with the deliberation itself, and cannot be disclosed without creating the very harms the deliberative process privilege is meant to protect against.

## CONCLUSION

For all the foregoing reasons, Defendant respectfully requests that this Court grant its motion for summary judgment.


Dated:  March 11, 2021                       Respectfully Submitted,

                                             BRIAN M. BOYNTON
                                             Acting Assistant Attorney General

                                             MARCIA BERMAN
                                             Assistant Director, Federal Programs Branch

29

*/s/ Antonia Konkoly*
Antonia Konkoly
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: 202-514-2395
Email: antonia.konkoly@usdoj.gov

*Counsel for Defendant*

30