**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


JUDICIAL WATCH, INC.,

                                                    Civil Action
            Plaintiff,                              No. 19-879

        vs.                                         Washington, DC
                                                    March 9, 2023
U.S. DOJ

            Defendant.                              1:05 p.m.
_____/


                TRANSCRIPT OF STATUS CONFERENCE
            **BEFORE THE HONORABLE CARL J. NICHOLS**
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the Plaintiff:**       **Ramona R. Cotca**
                             JUDICIAL WATCH, INC.
                             425 Third St. SW, Ste 800
                             Washington, DC 20024
                             (202) 646-5172 ext 328


**For the Defendant:**       **Antonia Konkoly**
                             U.S. DEPARTMENT OF JUSTICE
                             1100 L St., NW, Room 11110
                             Washington, DC 20005
                             (202) 514-2395




**Reported By:**             **LORRAINE T. HERMAN, RPR, CRC**
                             Official Court Reporter
                             U.S. District & Bankruptcy Courts
                             333 Constitution Avenue NW
                             Room 6720
                             Washington, DC 20001




*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  Good afternoon, Your Honor.  This

3    afternoon we have Civil Action No. 19-879, *Judicial Watch,*

4    *Inc. versus The United States Department of Justice*.

5          Would speaking counsel for the plaintiff followed

6    by speaking counsel for the defendant please approach the

7    lectern and identify yourself and your colleagues for the

8    record.

9          **MS. COTCA:**  Good afternoon, Your Honor.  Ramona

10   Cotca for Judicial Watch, and sitting with me is

11   Katie Blankenberg, co-counsel, and Tom Fitton on behalf of

12   Judicial Watch.

13          **THE COURT:**  Good afternoon.

14          **MS. KONKOLY:**  Good afternoon, Your Honor.  Antonia

15   Konkoly from the Department of Justice, and with me is

16   Marcia Berman also from the Department of Justice and Kara

17   Cain from the Executive Office of U.S. Attorneys.

18          **THE COURT:**  Good afternoon.

19          Here's what I want to do, probably briefly, but I

20   thought it would be helpful to have everybody together for

21   this.  I'm also in trial and this is just a little bit more

22   efficient so I appreciate everyone coming over here.

23          I'm going to articulate what I understand the

24   chronology as it relates to Mr. Ariail's emails, and then I

25   just want to have a conversation about really the question

1    of whether, as the government wants, we should just go to

2    summary judgment briefing or, if not, what it is that

3    Judicial Watch thinks I should do before that.

4            I believe this is the chronology, but please

5    correct me if I'm wrong.  The relevant meeting is April

6    2017.  Mr. Ariail is an attendee.  July 2018, Judicial Watch

7    submits the FOIA request to the Department.  And the request

8    gets -- and I can't remember if it's the Department and FBI,

9    but I don't think it's material because the request is

10   referred to the criminal division and the FBI only.

11           In September 2020, Judicial Watch tells the

12   Department, the government, that, in its view, it should be

13   searching for records at EOUSA.

14           In October 2020, the government says, We don't

15   believe we're required to do so and we're not going to do

16   that.

17           Obviously, that question, among others, is

18   litigated and resolved by me, at least in part, in my March

19   2022 opinion where I say, "Should have searched EOUSA for at

20   least Mr. Ariail's documents."

21           That month, or around there, the Department refers

22   the FOIA request to EOUSA for the purpose of attempting to

23   locate his relevant documents or responsive documents.

24           Over the next eight or nine months, searches of --

25   email searches occur.  Some of them, originally I guess,

1    retrieved no relevant information or potentially relevant

2    information -- or potentially responsive information.  And

3    then later searches retrieved potentially responsive

4    information that were later determined not to be responsive.

5    That's his emails.

6        And then, separately, there's -- as articulated in

7    the December 2022 joint status report, I believe there's the

8    question of whether there's a relevant case file maintained

9    at the U.S. Attorney's Office in the Southern District.  And

10   the government committed that, if there is one, it would

11   search for responsive records.

12       And then, of course, overlaying all of this is the

13   fact that the three-year records retention or destruction --

14   depending on your perspective -- policy kicks in.

15       And so I am inferring at least that, as early as

16   April 2020, emails that Mr. Ariail sent or received could

17   have been not maintained or could have been destroyed or

18   purged or whatever because there was no direction to EOUSA

19   or to him specifically or to the SDNY to preserve his

20   records because DOJ had taken -- or the Department had taken

21   the position that it need not search EOUSA.

22       So it's at least hypothetically possible that,

23   between April 2020 and March 2022, responsive records

24   were -- that existed, if any, would have been deleted

25   pursuant to that policy.

1          So from the plaintiff's perspective, do I have the

2     chronology basically right?

3          **MS. COTCA:**  Yes.

4          **THE COURT:**  Why don't you come forward to the

5     podium, please?

6          **MS. COTCA:**  I think Your Honor laid out the

7     chronology quite well.  Just this week though, however, we

8     did receive an email from opposing counsel that a new set of

9     records has been located, and I don't want to put it in

10    defense's words.  Since they have the information, I'll let

11    them explain how they came about.

12         But from the chronology standpoint, yes.  I mean,

13    I think there are questions though with respect to when

14    emails were deleted, the retention policy, et cetera, which

15    we can get into later.

16         **THE COURT:**  But let's assume, hypothetically, that

17    records that would have been responsive to the FOIA request

18    were, in fact, deleted pursuant to this policy.  They don't

19    exist anymore or I suppose I could --

20         **MS. COTCA:**  I don't know if they do.  We don't

21    know if they do.

22         **THE COURT:**  Well, they have not been located

23    pursuant to the search that has been conducted to date.

24         **MS. COTCA:**  I'm not sure what has been located, I

25    guess, as of this week.

1          **THE COURT:**  Okay.

2          Well, I guess I'll ask that question.

3          All right.  Why don't I hear from the government

4   about this most recent development.  Then I want to ask some

5   questions about, frankly, why we don't just get to summary

6   judgment if -- but in any event.

7          **MS. COTCA:**  I guess this does relate, this one

8   other point, with respect to the retention policy with

9   respect to the chronology.

10         The way that I read the retention policy, it's

11  not -- the defendants -- the Department of Justice is

12  referring to it as a three-year policy, but it's actually a

13  range of three to seven years.

14         And in the retention policy, it actually says that

15  the longer portion of the range is supposed to be followed,

16  unless there is a written policy that it should be on the

17  shorter term.

18         If -- and I'm looking at ECF-36-1, Your Honor.  So

19  if the range is three to seven years, unless there is a

20  written policy, then the retention of these emails should

21  have been seven years which --

22         **THE COURT:**  Should have been what?  Sorry.

23         **MS. COTCA:**  Seven years because that is the range.

24  The retention period on Page 5 of 7 of ECF-36-1 is --

25         **THE COURT:**  So are you going to argue at summary

1    judgment that there is -- if the three-year policy applied

2    here by the government -- was applied by the government that

3    it somehow should have been longer and that you have some,

4    like, enforcement right as to that?  It creates some sort of

5    private right?

6            **MS. COTCA:**  I guess we don't know -- perhaps, Your

7    Honor.

8            The reason we wanted the status hearing and the

9    reason we're getting a little bit further ahead is summary

10   judgment is premature because we don't have the facts to be

11   able to oppose the summary judgment and know how to respond

12   to a summary judgment.

13           **THE COURT:**  But you can say that the summary

14   judgment is inadequate based on whatever facts are proffered

15   by the government.

16           **MS. COTCA:**  We could.  But, I guess, at this point

17   we already know that there's information that we need with

18   respect to this batch of records and what happened.

19           **THE COURT:**  So --

20           **MS. COTCA:**  But --

21           **THE COURT:**  -- specifically, what information do

22   you want me to order the government to give you now in

23   advance of summary judgment briefing?

24           **MS. COTCA:**  Were his emails deleted, in fact

25   deleted?  Because in December -- I mean, there's conflicting

1    information.  In December -- in our December 2nd JSR --

2                **THE COURT:**  Right.  There are some.  There are

3    some emails from this period that are not deleted obviously.

4                **MS. COTCA:**  Correct.

5                **THE COURT:**  I think that's undisputed.  Okay.

6                **MS. COTCA:**  Correct.  Who deleted the emails?  Is

7    it an automatic deletion where it's the anniversary date

8    from when the email was received or sent that there's an

9    automatic deletion process?  Are those emails, once they're

10    deleted, are they archived?

11                Is there an ability to go and recover those emails

12    through some kind of an archival system?  Is that how these

13    other batch that were located in December found?

14                I have a list, actually of -- just to fully answer

15    your question.  How they were deleted.

16                **THE COURT:**  Were they?

17                **MS. COTCA:**  Were they deleted is really --

18                **THE COURT:**  You said, were relevant records or

19    potentially responsive records deleted?

20                **MS. COTCA:**  Correct.

21                **THE COURT:**  You want to know that if it's

22    knowable.

23                **MS. COTCA:**  Right.  Correct.

24                **THE COURT:**  Who did so?  How was it done?

25                **MS. COTCA:**  I'm sorry?

1          **THE COURT:**  Who and how?

2          **MS. COTCA:**  Who and how and, I guess, how was the

3     determination to just -- decided with respect to what emails

4     to be deleted and what not?

5          And really, I think, with respect to this

6     retention policy, if this is what's the relevant policy that

7     the office is leaning on, is there a written policy -- I

8     mean, is it a three-year retention or is it a seven-year

9     retention?  And I think that's very important to know

10    whether these emails were deleted before they even should

11    have been deleted.

12         And the other question that is arising as a result

13    of the new information --

14         **THE COURT:**  Doesn't all that assume that there was

15    an obligation to preserve them?

16         **MS. COTCA:**  Well, if their retention policy is

17    seven years, yes.

18         **THE COURT:**  No, some other -- I mean, that's an

19    internal DOJ policy.  I'm talking about some external legal

20    obligation?

21         **MS. COTCA:**  Well, the emails that we're talking

22    about -- I mean, that's the other question.  The emails

23    we're talking about that we know exist that CRIM, the

24    criminal division produced, they are being referred to by

25    the DOJ as temporary, as emails.

1          However, under the definition, I mean, under the

2     U.S. Code, I mean, these have to do with the government

3     business and retention.  It's not an email with respect to,

4     I am running late to a meeting and so it's a transitory

5     record.

6          The emails that we're highlighting and we produced

7     to the Court discuss the government's litigation and

8     investigation strategy against Paul Manafort.  These are

9     substantive communications, not transitory or temporary

10    records about where should we go for lunch.

11         **THE COURT:**  So you think, so that, in your view,

12    the government had an obligation to preserve these emails.

13    Is it because of the DOJ policy?  Is it because of the

14    pendency of the FOIA litigation or is there some federal

15    statute that you say requires them to preserve them?

16         **MS. COTCA:**  Perhaps all three, Your Honor.

17         **THE COURT:**  Okay.

18         **MS. COTCA:**  Perhaps all three, because if they're

19    deleted during the pendency of this litigation, it's

20    incumbent on -- it's a notice issue.  Right?  It's not --

21         **THE COURT:**  What FOIA remedy do you have if there

22    was such deletion?

23         **MS. COTCA:**  Well, if there was a deletion, that's

24    the point.

25         I think then the point would be, okay.  What other

1    custodians were in Mr. Ariail's office at the time whom he

2    would have communicated with where there would be relevant

3    records?  Because the FOIA request is for communication but

4    also notes, et cetera.

5            And search those because the universe of his

6    records are in doubt at this point.

7            **THE COURT:**  Okay.

8            **MS. COTCA:**  So that would be the remedy that

9    plaintiff would ask for.

10           **THE COURT:**  Fair enough.  Let me hear from the

11   government because I'd like to understand this recent

12   development and then, of course, understand from the

13   government's perspective answers to my questions from its

14   view.  So, Counsel?

15           **MS. KONKOLY:**  Thank you, Your Honor.

16           **THE COURT:**  Do I have the chronology basically

17   right?

18           **MS. KONKOLY:**  The chronology you stated is

19   correct.

20           **THE COURT:**  Great.  Thank you.

21           **MS. KONKOLY:**  Indeed.

22           If I may start with just a clarification about the

23   retention policy and then circle back to new documents that

24   have surfaced?

25           **THE COURT:**  Sure.

1          **MS. KONKOLY:**  The document that is on the docket

2     that was provided to plaintiff and that they attached as an

3     exhibit is a request for disposition authority from DOJ to

4     the National Archives.

5          And in that document NARA grants DOJ permission to

6     dispose of emails such as the ones that are at issue here

7     where those emails are not subject to any of three

8     conditions.  The first being that a capstone official is not

9     either a sender or recipient of the email.

10          The second being that the email is not subject to

11     a litigation hold.  And then the third being that it's not

12     something that needs to be independently saved to a case

13     file.

14          That policy does give DOJ permission to delete

15     such records as soon as three years after their creation.

16     And the clarification I'd like to provide is that there are

17     two additional policy documents that are not currently

18     public that have not, to date, been shared with Judicial

19     Watch but that I have obtained permission to file with the

20     Court and share with Judicial Watch now.

21          The first is a DOJ-wide policy that specifies that

22     for Capstone officials, those emails should be saved for 15

23     years and then assessed over to NARA.  And for everybody

24     else, for cases that aren't subject to a lit hold, don't

25     meet the standard for needing to be saved to a case file,

1    there is, again, a minimum of three or a maximum of seven

2    years, and then it essentially delegates to DOJ components

3    to select the retention period for such emails.  EOUSA has

4    implemented a policy and this is the second policy document

5    that I do have permission to share at this time.

6            EOUSA has a written policy where it has elected

7    the three-year policy.

8            **THE COURT:**  Right.

9            So what all that means is that, as approved by

10   NARA, that emails that are basically subject to EOUSA

11   jurisdiction or whatever you might say, but from an SDNY

12   EOUSA, can be deleted after three years, if there is no

13   litigation hold and if they are not saved to a case file or

14   not required to be saved to a case file.

15           **MS. KONKOLY:**  And, thirdly, if they don't involve

16   a Capstone.

17           **THE COURT:**  Yeah, absolutely.  Sorry.  I'm sort of

18   assuming that he is not one.

19           **MS. KONKOLY:**  He is not.

20           **THE COURT:**  Yes.

21           **MS. KONKOLY:**  And no one on his emails was and we

22   have confirmed that to Judicial Watch.

23           **THE COURT:**  So let me ask you this question which

24   you may not be prepared to answer today, which is -- I

25   understand the government's position is there was no

1      litigation hold as to the EOUSA records here.  I obviously

2      had a different view about whether a search should have

3      occurred at EOUSA in March 2022.

4              What is the effect of my having concluded that a

5      search should have happened perhaps during the period

6      when -- that would have predated the -- a disposition of

7      responsive records here?

8          **MS. KONKOLY:**  Your Honor, we've received the

9      Court's memorandum opinion.  And we promptly made the

10     referral to EOUSA, so we complied with that order as soon as

11     we had it.

12         **THE COURT:**  Right.  But you could -- not holding

13     this, right, but just as we're talking here, you could

14     construe my opinion as implying that there should have been

15     a litigation hold directed to EOUSA as early as July 2018.

16     Obviously one was not.

17             Imagine, hypothetically, if -- rather than just

18     talk about EOUSA, if the government had taken the position

19     that it was only going to refer this request to the FBI and

20     not the criminal division and I later determined that was

21     wrong, and then all the criminal division -- assuming the

22     criminal division has the same retention policy as EOUSA and

23     I later determined that the failure to refer to criminal

24     division was wrong and a bunch of stuff was disposed of, is

25     it the government's view that that would be not a problem?

1        **MS. KONKOLY:**  One very minor factual correction,

2   which is just that this FOIA request was sent to FBI and

3   then also to DOJ and it was --

4        **THE COURT:**  I know I conflated those at the

5   beginning.

6        **MS. KONKOLY:**  Sure.

7        **THE COURT:**  Yes.

8        **MS. KONKOLY:**  But I understand the hypothetical

9   and the question.  Your Honor, because of that situation, I

10  do understand the point you are raising and exactly because

11  of those circumstances.  Our view is that we've gone above

12  and beyond what is required from the supplemental search and

13  we have really have gone well past the reasonableness

14  standard that FOIA requires for a search.

15        This feeds into the new documents that actually

16  have surfaced if I could pause to explain what happened

17  there?

18        **THE COURT:**  Yes, please.  Yeah, thank you.

19        **MS. KONKOLY:**  In late January, I had a

20  conversation with former AUSA Ariail and he confirmed that

21  he was at this meeting.  He had been there in his capacity

22  as the former head of the EDNY's organized crime and gang

23  units.

24        He confirmed that he didn't take any records with

25  him when he left government service.  He confirmed that

1    there was no EDNY case file for -- that would, you know,

2    pertain to that meeting.

3            **THE COURT:**  I'm sorry.  I kept saying SDNY.  He is

4    EDNY?

5            **MS. KONKOLY:**  He's EDNY, exactly.

6            He confirmed that there had been no case file that

7    was associated or related to that meeting maintained by his

8    office.  And further that, even if there had been one that,

9    as he recalled, the, you know, email exchanges that he was

10   on, the fairly minimal ones that pertained to that meeting

11   or came out of it, that they were not the type of emails

12   that he would, you know, was required to or would have saved

13   to such a case file.

14           We had that conversation in late January, and I

15   gather a few weeks later he reached out to a former

16   colleague of his at EDNY.  This former colleague is one of

17   the names that is also -- it was redacted on some of the

18   emails that CRIM produced.  I'm just going to refer to this

19   person as "the colleague" that Mr. Ariail worked with.

20           And he alerted the colleague to the existence of

21   the FOIA request and the lawsuit.  The colleague had not

22   been previously aware of either of those things, nor did

23   EOUSA have any reason to know what the colleague knew, which

24   is that, when Mr. Ariail left government service at the end

25   of May 2018, he left a handful of notebooks with this

1    colleague.

2            These notebooks were arranged chronologically.  I

3    understand that he essentially kept a daily log of his

4    meetings or, in any event, some of them.  And because they

5    were so arranged and his colleague recalled that the

6    notebooks had been left with them, they found the notebooks

7    and they searched them and they found Mr. Ariail's meeting

8    notes from the AP meeting on the morning of April 11th,

9    2017.

10            The colleague further recalled -- this colleague

11    had not been at the AP meeting, which is the subject of the

12    FOIA requests.  But the colleague did recall that later that

13    same day, there was an independent meeting.  It wasn't

14    related to the AP meeting.  It wasn't an outgrowth of that.

15    It was independently scheduled, but the colleague and

16    Mr. Ariail were both at that afternoon meeting.  And the

17    colleague recalled that the mornings' meeting might have

18    been briefly discussed at the afternoon meeting.

19            So the colleague further searched Mr. Ariail's

20    notebooks and found his meeting notes from the afternoon

21    meeting.  The colleague has a similar notebook of her own

22    and found their own notes from that afternoon meeting as

23    well.  So those are three of the new records.  We've got

24    Ariail's meeting notes from both meetings and hers from the

25    afternoon meeting.

1          And then I mentioned a moment ago that this

2     colleague had been CC-ed on some of the emails that have

3     already been located and produced by CRIM.  So the colleague

4     further recalled those emails and did a search of their

5     Outlook accounts and located a total of 17 potentially

6     responsive emails.  Four or five of those are the same

7     emails that CRIM already found, already produced.  It's this

8     colleague's own version of those.

9          And I should explain that the three-year automatic

10    deletion policy and algorithm, it doesn't apply to emails of

11    an active AUSA's Outlook application on their desktop.

12         So on the back end, emails are automatically

13    deleted at the 3-year-and-30-day mark actually, but if

14    you're still a current employee, you may have emails that

15    are older than that.

16         **THE COURT:**  If they're in your active Outlook?

17         **MS. KONKOLY:**  Exactly.

18         So the colleague found, as I said, a total of 17

19    emails.  Four or five of them are ones that have already

20    been produced.  Four or five are some logistical records

21    related to the afternoon meeting.

22         And then the remaining ones, it's not clear that

23    they're responsive.  They're fairly attenuated and EOUSA is

24    processing them right now.  So we have a total of 20

25    additional records that have surfaced that, again, went from

1    our efforts to reach out to Mr. Ariail, as a former AUSA, to

2    see, you know, what insight he might be able to shed on

3    this.

4               **THE COURT:**  Okay.  Thank you for that.

5               Let me ask you this question.  Do you know one way

6    or the other whether the disposition policy was applied to

7    his emails?

8               **MS. KONKOLY:**  Your Honor, there is no record of

9    the deletion.  I can tell you that, pursuant to that policy,

10   there is an algorithm in EOUSA's sort of back-end archival

11   system.  Three years and 30 days from an email being sent or

12   received, again, if that email is not subject to a lit hold,

13   it doesn't have a Capstone official on it and,

14   independently, it wasn't saved to a case file, then --

15              **THE COURT:**  It will be deleted.

16              **MS. KONKOLY:**  -- 3 years and 30 days the algorithm

17   comes in and every day it's deleting the emails that have

18   hit that birthday.

19              **THE COURT:**  And it sounds like, because he wasn't

20   a Capstone official, because there was no litigation hold

21   and because, as you said before based on your conversation

22   with him, he did not believe these were the emails that he

23   had sent were the kinds that he would save to a case file,

24   though the three conditions for the algorithm not to run

25   weren't there or weren't in existence, it was, as of May

1    2017 -- sorry, May 2020 and thereafter, it was 3 years and

2    30 days.

3           Obviously, there might have been later emails.

4    That's why I think it's not just about April 2017 emails.

5    But as to April 2017 emails, May 2020, the algorithm would

6    run and it would delete emails if they don't fall into one

7    of the three categories you mentioned.

8           So there's every reason to believe, though we may

9    not know, that responsive emails were deleted.  Correct?

10          **MS. KONKOLY:**  That's exactly right, Your Honor.

11          **THE COURT:**  So you've just described, at least

12   generally, the most I take it that you think you can figure

13   out about deletion?

14          **MS. KONKOLY:**  I think that's correct.

15          **THE COURT:**  The most you can figure out about the

16   who?

17          **MS. KONKOLY:**  Yes.

18          **THE COURT:**  That is to say it's an electronic

19   algorithm that's running in the background?

20          **MS. CAIN:**  Yep.

21          **THE COURT:**  And how you've just described?

22          **MS. KONKOLY:**  Indeed.

23          **THE COURT:**  So is there anything else you'd like

24   to mention?  I want to now ask plaintiff why, in light of

25   this information, we shouldn't just take up the question of

1    what implications there are for the case about the fact

2    that -- it sounds to me that the best information we have

3    available is that potentially responsive emails were not

4    retained.

5        **MS. KONKOLY:**  Pursuant to the algorithm and the

6    automatic application.

7        **THE COURT:**  Yes, of course.  I'm not drawing any

8    conclusions from that.  I just think that's close to a fact

9    at this point.

10        **MS. KONKOLY:**  Yes, Your Honor.

11        I don't have anything further unless you have any

12    questions from me.

13        **THE COURT:**  No, but the government's view, I take

14    it, is that it wants to brief summary judgment on all of the

15    questions that might arise.  And it would be prepared to

16    brief the question of what remedy or what result occurs as a

17    result of the very likely presumed deletion that happened

18    with these emails.  Correct?

19        **MS. KONKOLY:**  We are prepared to proceed to

20    briefing on both of those questions.

21        **THE COURT:**  Okay.  Thank you.  So let me hear

22    again from plaintiff.  So thank you very much.

23        Obviously, the government can put this information

24    in a declaration.  But you now have a fair amount of

25    information about how this all worked or would have worked.

1   You'll get the policies.  You'll get your new production.

2          I understand your position that you may want a

3   remedy of various types.  But why isn't that exactly the

4   kind of thing we should be briefing at summary judgment now

5   that the record seems to be getting somewhat more joined or

6   the issues at least?

7          **MS. COTCA:**  Well, frankly, Your Honor, plaintiff

8   was just -- you know, all of the information we have been

9   getting has been drip by drip and piecemeal.

10          **THE COURT:**  Well, that's the good thing about

11  summary judgment briefing is the government has to put

12  everything on the table that it needs to support its motion.

13  And if it's inadequate, it adds peril.

14          **MS. COTCA:**  Correct, Your Honor.

15          But, you know, we were -- the parties have been

16  conferring and, from plaintiff's standpoint, in good

17  faith --

18          **THE COURT:**  Uh-huh.

19          **MS. COTCA:**  -- for almost a year, a significant

20  amount of time.  And the government keeps relying and saying

21  and repeating that -- and it's gone above and beyond it's

22  obligations under FOIA or out of abundance of caution.

23          But as of August, I mean, it just kept running

24  searches, if this policy is correct and based on what

25  they're saying at this point, running searches for records

1    the government knew weren't even in the system.

2         And frankly, Your Honor, when -- only because we

3    probed how these emails weren't coming up in the searches is

4    that the government finally confessed with respect to

5    perhaps that these emails were deleted.

6         **THE COURT:**  Right.  The problem is, at this point,

7    a fair amount of information has flowed.  The government has

8    made a series of representations here today.  I'm not

9    interested in being a referee of the back-and-forth.

10        **MS. COTCA:**  Sure.

11        **THE COURT:**  I want to get to the point where I'm

12   resolving the issues in this case and why aren't we there?

13        **MS. COTCA:**  One significant question that hasn't

14   been answered and that, if the government is in a position

15   to provide this information now or in short order, would

16   be -- we understand that, according to Mr. Ariail, there

17   wasn't a case file for the meeting.  But I think it's

18   important to note -- was there a case file in his office for

19   Paul Manafort because --

20        **THE COURT:**  Well, I think that counsel just said

21   there was no case file in the Eastern District of New York

22   for this matter, which I took to mean the *Manafort* matter,

23   not the meeting with AP.

24        **MS. COTCA:**  My understanding --

25        **THE COURT:**  And I doubt that the Eastern District

1    of New York opened a case file for a meeting with a

2    reporter.

3            **MS. KONKOLY:**  If I may, I can confirm that EDNY

4    had no case file related to Paul Manafort.

5            **MS. COTCA:**  Thank you.  I appreciate that.  Thank

6    you.

7            **THE COURT:**  Right.  So I think that, at least as

8    to the case file, the government noted in the December joint

9    status report that it was looking to see if there was a case

10   file in EDNY.  And it has now determined, based on a direct

11   communication with AUSA, that there wasn't one.

12           **MS. COTCA:**  Yes.  I appreciate that.  According to

13   the correspondence back and forth, there was reference to a

14   case file with respect to the meeting not with respect to

15   Paul Manafort.  So I appreciate the clarification.

16           With respect to moving to summary judgment, Your

17   Honor, I still think there are a few more gaps.  With

18   respect to the remedy, whether it -- the plaintiff may need

19   to file a -- instead of an opposition, a 56(d) response.

20           **THE COURT:**  Absolutely.

21           **MS. COTCA:**  You know.  That's fine.

22           **THE COURT:**  Right.  And I -- to be very clear, I

23   am not deciding anything about whether I think, assuming

24   this is all what happened, essentially no litigation hold

25   because no referral to EOUSA, therefore very likely

1    inference is deletion of responsive records while your FOIA

2    request was pending.  I'm not making any -- I'm drawing no

3    conclusion about what effect that has on your claims in this

4    case, what remedy I might impose.

5             I just think that we've now -- I think we've taken

6    a step forward and say like -- now there's a fair amount of

7    shared understanding about what happened and now we can

8    brief the so what.

9             **MS. COTCA:**  Sure, Your Honor.

10            **THE COURT:**  Okay.

11            So I know there was some discussion around the

12   briefing schedule.  We took a while to get to this status

13   conference.  My recollection is, obviously, the government

14   had proposed a briefing schedule and then you wanted some

15   briefs in there.  Do you have a view right now of what's an

16   appropriate schedule to set?

17            **MS. COTCA:**  I don't.  I know that opposing counsel

18   is going to be away for a while.

19            **THE COURT:**  How about this?

20            **MS. COTCA:**  But I suppose I would just say, with

21   respect to a briefing schedule, I think plaintiff would like

22   reservation to either file an opposition or a 56(d)

23   response.

24            **THE COURT:**  Why don't we do this because it's very

25   likely much more efficient than my talking about everyone's

1    schedules and the like.

2            I'd like, in light of this, I would like to now

3    set a summary judgment briefing schedule.  I understand that

4    plaintiff's position may be we need more information, we

5    need discovery, government hasn't satisfied its burden,

6    et cetera.  All of that is on the table.

7            What I would like is for plaintiff and government

8    to confer around an appropriate summary judgment briefing

9    schedule.  The one thing I would say is I'm not a huge fan

10   of a six-step schedule.  If, for example, plaintiff were

11   going to move, I'd much rather have, at most, four, right,

12   motion, cross-motion with opposition and opposition and

13   reply in there.

14           But I leave it to the parties to try to work it

15   out.  But what I would like is to take us to the summary

16   judgment briefing stage.  Obviously, if I can resolve the

17   motion or motions, I will and, if not, we'll decide why not,

18   and it may be because of these spoliation claims.

19           So anything else you need from me today, Counsel?

20           **MS. COTCA:**  (No response.)

21           **THE COURT:**  Clear enough?

22           So we'll just -- why don't I make very clear?  I

23   would like the parties to meet and confer and to submit, no

24   later than March 17th, a proposed -- hopefully joint

25   proposed summary judgment briefing schedule.

1            To the extent there's disagreement about the

2      schedule, just file something jointly as you have been and

3      note the disagreement, and I'll resolve it.  Okay?  Thank

4      you, all.

5                **MS. COTCA:**  Thank you, Your Honor.

6                **MS. KONKOLY:**  Thank you.

7          (Proceedings concluded at 1:39 p.m.)

1
2

**C E R T I F I C A T E**

3

    I, **Lorraine T. Herman, Official Court Reporter,**

4

certify that the foregoing is a true and correct transcript

5

of the record of proceedings in the above-entitled matter.

6
7
8
9

    April 20, 2023        /s/  Lorraine T. Herman

10

          **DATE**            **Lorraine T. Herman**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25