IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | Civil Action No. 1:19-cv-879 (CJN) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................2

I.      EOUSA and EDNY's Supplemental Searches Were Adequate ...................................2

II.     Defendant Properly Withheld Certain Information Pursuant to Exemption 5, 6, 7(C),
        and 7(E) .............................................................................................................13

        A.      EOUSA's Attorney Work-Product Privilege Assertion is Proper..................13

        B.      CRM Properly Withheld Information under Exemption 5..........................17

        C.      OIP, CRM, and FBI Properly Withheld Information under Exemptions 6,
                7(C), and 7(E) .....................................................................................20

                1.      OIP Properly Withheld the ODAG Email Address of Bruce Ohr
                        under Exemption 6 ....................................................................20

                2.      CRM and FBI Properly Withheld Certain Information under
                        Exemptions 6 and 7(C) ..............................................................22

                3.      Disclosure of the Information Withheld Pursuant to Exemptions 6
                        and 7(C) Would Cause Foreseeable Harm ...................................26

                4.      FBI Properly Withheld a Special Agent's Email Address under
                        Exemption 7(E)........................................................................27

III.    OIP, CRM, and FBI Processed and Released All Reasonably Segregable Information..........29

IV.     In Camera Review Is Neither Necessary nor Appropriate ..........................................30

CONCLUSION .....................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*100Reporters v. U.S. Dep't of State,*
    602 F. Supp. 3d 41 (D.D.C. 2022) ..............................................................................29

*A. Michael's Piano, Inc. v. Fed. Trade Comm'n,*
    18 F.3d 138 (2d Cir. 1994) ........................................................................................14

*ACLU v. U.S. Dep't of Def.,*
    628 F.3d 612 (D.C. Cir. 2011) ...................................................................................30

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review,*
    830 F.3d 667 (D.C. Cir. 2016) ...................................................................................23

*Ancient Coin Collectors Guild v. U.S. Dep't of State,*
    866 F. Supp. 2d 28 (D.D.C. 2012) ...............................................................................5

*Associated Press v. U.S. Dep't of Just.,*
    549 F.3d 62 (2d Cir. 2008) ........................................................................................30

*Bagwell v. U.S. Dep't of Just.,*
    588 F. Supp. 3d 58 (D.D.C. 2022) .............................................................................18

*Beck v. Dep't of Just.,*
    997 F.2d 1489 (D.C. Cir. 1993) .................................................................................21

*Blackwell v. FBI,*
    646 F.3d 37 (D.C. Cir. 2011) .....................................................................................27

*Blanton v. U.S. Dep't of Just.,*
    182 F. Supp. 2d 81 (D.D.C. 2002), *aff'd on other grounds,* 64 F. App'x 787 (D.C. Cir. 2003)................6

*Buzzfeed, Inc. v. U.S. Dep't of Homeland Sec.,*
    610 F. Supp. 3d 139 (D.D.C. 2022) ...........................................................................29

*Buzzfeed, Inc. v. U.S. Dep't of Just.,*
    No. CV 19-1977 (EGS), 2023 WL 6847008 (D.D.C. Oct. 17, 2023)...........................24, 28

*Campbell v. U.S. Dep't of Just.,*
    164 F.3d 20 (D.C. Cir. 1998) .......................................................................................4

*Chilingirian v. U.S. Att'y Exec. Off.,*
    71 F. App'x 571 (6th Cir. 2003) ..................................................................................7

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Just.*,
   746 F.3d 1082 (D.C. Cir. 2014) ..................................................................................22

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*,
   822 F. Supp. 2d 12 (D.D.C. 2011) .............................................................................25

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of State*,
   No. CV 19-1344 (RBW), 2022 WL 1801054 (D.D.C. June 2, 2022)...............................26

*Clemente v. FBI,*
   867 F.3d 111 (D.C. Cir. 2017) ...................................................................................23

*Dalal v. U.S. Dep't of Just.,*
   643 F. Supp. 3d 33 (D.D.C. 2022) ...................................................... 18, 23, 24, 28

*Davis v. U.S. Dep't of Justice,*
   968 F.2d 1276 (D.C. Cir. 1992) .................................................................................24

*Dep't of Air Force v. Rose,*
   425 U.S. 352 (1976) ..................................................................................................20

*DiBacco v. U.S. Army,*
   795 F.3d 178 (D.C. Cir. 2015) ...................................................................................12

*Dixon v. U.S. Dep't of Just.,*
   279 F. Supp. 3d 1 (D.D.C. 2017), *aff'd*, 2018 WL 4610736 (D.C. Cir. Sept. 10, 2018) ......5

*Ecological Rts. Found. v. U.S. Env't Prot. Agency,*
   541 F. Supp. 3d 34 (D.D.C. 2021) .............................................................................26

*Elec. Priv. Info. Ctr. v. DHS,*
   384 F. Supp. 2d 100 (D.D.C. 2005) ...........................................................................30

*Fischer v. U.S. Dep't of Just.,*
   596 F. Supp. 2d 34 (D.D.C. 2009) .............................................................................24

*Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.,*
   608 F.2d 1381 (D.C. Cir. 1979) .................................................................................31

*Heggestad v. U.S. Dep't of Just.,*
   182 F. Supp. 2d 1 (D.D.C. 2000) ...............................................................................14

*Horowitz v. Peace Corps,*
   428 F.3d 271 (D.C. Cir. 2005) ...................................................................................25

*Juarez v. U.S. Dep't of Just.,*
   518 F.3d 54 (D.C. Cir. 2008) .....................................................................................29

*Judicial Watch v. U.S. Dep't of State*,
   272 F. Supp. 3d 88 (D.D.C. 2017) ................................................................1

*Judicial Watch, Inc. v. IRS*,
   Civ. A. No. 13-1759 (EGS), 2015 WL 4072431 (D.D.C. July 3, 2015) ...............5

*Judicial Watch, Inc. v. U.S. Dep't of Def.*,
   715 F.3d 937 (D.C. Cir. 2013) ...............................................................17

*Judicial Watch, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
   20 F. Supp. 3d 247 (D.D.C. 2014) ...........................................................3

*Judicial Watch, Inc. v. U.S. Dep't of Just.*,
   Civ. A. No. 1:19-cv-0879 (CJN), 2022 WL 898825 (D.D.C. Mar. 28, 2022)...................8, 10, 11, 12

*Judicial Watch, Inc. v. U.S. Dep't of State*,
   Civ. A. No. 15-687 (JEB), 2021 WL 3363423 (D.D.C. Aug. 3, 2021)..................4

*Kendrick v. FBI*,
   Civ. A. No. 20-cv-2900 (TNM), 2022 WL 4534627 (D.D.C. Sept. 28, 2022), *appeal filed*,
   No. 22-5271 (D.C. Cir. Oct. 17, 2022)......................................................26

*Long v. Off. of Pers. Mgmt.*,
   692 F.3d 185 (2d Cir. 2012) .................................................................25

*Louise Trauma Ctr. LLC v. U.S. Dep't of Homeland Sec.*,
   No. 1:20-CV-01128 (TNM), 2022 WL 1081097 (D.D.C. Apr. 11, 2022)...................19

*Machado Amadis v. U.S. Dep't of Just.*,
   388 F. Supp. 3d 1 (D.D.C. 2019), *aff'd*, 971 F.3d 364 (D.C. Cir. 2020)..................19

*Mayer Brown LLP v. IRS*,
   562 F.3d 1190 (D.C. Cir. 2009) .............................................................27

*Meeropol v. Meese*,
   790 F.2d 942 (D.C. Cir. 1986) .........................................................12, 13, 30

*Mil. Audit Project v. Casey*,
   656 F.2d 724 (D.C. Cir. 1981) .............................................................16, 17

*Mobley v. CIA*,
   924 F. Supp. 2d 24 (D.D.C. 2013), *aff'd*, 806 F.3d 568 (D.C. Cir. 2015)................4

*Nation Magazine v. U.S. Customs Serv.*,
   71 F.3d 885 (D.C. Cir. 1995) ..............................................................24

iv

*Nat'l Ass'n of Crim. Def. Laws. v. U.S. Dep't of Just. Exec. Off. for U.S. Att'ys,*
844 F.3d 246 (D.C. Cir. 2016) ..................................................................................................18

*Nat'l Ass'n of Retired Fed. Emps. v. Horner,*
879 F.2d 873 (D.C. Cir. 1989) ..................................................................................................22

*Nat'l Lab. Rels. Bd. v. Robbins Tire & Rubber Co.,*
437 U.S. 214 (1978) .....................................................................................................................30

*Nat'l Student Legal Def. Network v. U.S. Dep't of Educ.,*
Civ. A. No. 1:19-cv-03473 (CJN), 2022 WL 1223707 (D.D.C. Apr. 26, 2022) ...............4

*Nova Oculus Partners, LLC v. U.S. Sec. & Exch. Comm'n,*
486 F. Supp. 3d 280 (D.D.C. 2020) .........................................................................................22

*Passmore v. U.S. Dep't of Just.,*
245 F. Supp. 3d 191 (D.D.C. 2017), *aff'd,*
No. 17-5083, 2017 WL 4231167 (D.C. Cir. Sept. 13, 2017) ..............................................24

*PHE, Inc. v. Dep't of Justice,*
983 F.2d 248 (D.C. Cir. 1993) ..................................................................................................30

*Poitras v. Dep't of Homeland Sec.,*
303 F. Supp. 3d 136 (D.D.C. 2018) .........................................................................................28

*Pratt v. Webster,*
673 F.2d 408 (D.C. Cir. 1982) ..................................................................................................23

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.,*
740 F.3d 195 (D.C. Cir. 2014) ..................................................................................................27

*Reed v. Nat's Lab. Rels. Bd.,*
927 F.2d 1249 (D.C. Cir. 1991) ................................................................................................20

*Reps. Comm. for Freedom of Press v. FBI,*
3 F.4th 350 (D.C. Cir. 2021) .....................................................................................................19

*Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.,*
567 F. Supp. 3d 97 (D.D.C. 2021), *appeal dismissed,*
No. 21-5293, 2022 WL 801357 (D.C. Cir. Mar. 15, 2022) .................................................29

*Reyes v. U.S. Env't Prot. Agency,*
991 F. Supp. 2d 20 (D.D.C. 2014) .............................................................................................4

*Roseberry-Andrews v. Dep't of Homeland Sec.,*
299 F. Supp. 3d 9 (D.D.C. 2018) .............................................................................................25

*Roth v. U.S. Dep't of Just.*,
  642 F.3d 1161 (D.C. Cir. 2011) ...........................................................................22

*SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*,
  926 F.2d 1197 (D.C. Cir. 1991) .............................................................................3

*Schiller v. Nat'l Lab. Rels. Bd.*,
  964 F.2d 1205 (D.C. Cir. 1992), *abrogated on other grounds by Milner v. Dep't of the Navy*,
  562 U.S. 562 (2011) ...............................................................................................14

*Schoenman v. FBI*,
  Civ. A. No. 04-2202 (CKK), 2006 WL 1126813 (D.D.C. Mar. 31, 2006) ...........................................7

*Schrecker v. U.S. Dep't of Just.*,
  349 F.3d 657 (D.C. Cir. 2003) ..............................................................................24

*Shurtleff v. U.S. Env't Prot. Agency*,
  991 F. Supp. 2d 1 (D.D.C. 2013) ..........................................................................21

*Sorin v. U.S. Dep't of Just.*,
  758 F. App'x 28 (2d Cir. 2018) ..............................................................................17

*Steinberg v. U.S. Dep't of Just.*,
  23 F.3d 548 (D.C. Cir. 1994) ...................................................................................3

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ............................................................................29

*U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*,
  510 U.S. 487 (1994) ........................................................................................21, 25

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*,
  489 U.S. 749 (1989) ........................................................................................21, 22

*United States v. Adlman*,
  134 F.3d 1194 (2d Cir. 1998) ................................................................................19

*United States v. Deloitte LLP*,
  610 F.3d 129 (D.C. Cir. 2010) ..............................................................................14

*Walston v. U.S. Dep't of Def.*,
  238 F. Supp. 3d 57 (D.D.C. 2017) ........................................................................25

*Washington Post Co. v. Special Inspector Gen. for Afghanistan Reconstruction*,
  Civ. A. No. 18-cv-2622 (ABJ), 2021 WL 4502106 (D.D.C. Sept. 30, 2021)...............................27

**STATUTES**

5 U.S.C. 552 ........................................................................................................................................*passim*

## INTRODUCTION

After several years of pending litigation, this case is ripe for final resolution, and the Court should enter summary judgment for Defendant on two sets of remaining issues. The first is whether the numerous, and extensive, supplemental searches conducted by the U.S. Department of Justice ("DOJ")—inclusive of certain final discretionary searches that DOJ has recently conducted (and which are discussed in more detail below)—suffice to meet the "reasonableness" standard established by the Freedom of Information Act ("FOIA"). While Plaintiff acknowledges that, pursuant to this standard, "an agency need not move heaven and earth to uncover every conceivable responsive record," Pl.'s Cross Mot. for Summ. J. at 8, ECF No. 50 ("Pl.'s Mem.") (quoting *Judicial Watch v. U.S. Dep't of State*, 272 F. Supp. 3d 88, 93-94 (D.D.C. 2017)), it in fact seeks to apply such a demanding standard. DOJ's exhaustive searches have, at this point, gone well beyond FOIA's reasonableness standard, and the Court should accordingly enter summary judgment in Defendant's favor as to search adequacy.

Second, Defendant's supplemental searches have resulted in the aggregate production of 22 pages of responsive—albeit almost entirely duplicative—email records, and further yielded two sets of DOJ attorney notes. Pursuant to FOIA Exemption 5 and the attorney work product privilege, the Executive Office for U.S. Attorneys ("EOUSA") redacted (as relevant here) one line of one of the emails contained within the eight pages of its supplemental production, and also withheld both sets of attorney notes in full. The new discretionary searches conducted DOJ's Criminal Division ("CRM") and Office of Information Policy ("OIP") yielded a total of 14 additional pages of email records, as to which CRM, OIP, and the Federal Bureau of Investigation ("FBI") have made certain withholdings pursuant to FOIA Exemptions 5 to protect information that is subject to governmental privileges; 6 and 7(C), to protect the privacy interests federal and law enforcement

personnel and a private third party; and 7(E), to protect certain sensitive law enforcement information. As set forth in detail here, all of these withholdings are amply justified under FOIA's standards, and all reasonably segregable non-exempt material has been disclosed to Plaintiff. Accordingly, the Court should enter summary judgment in DOJ's favor as to all challenged withholdings, as well.

## **ARGUMENT**

### **I.     EOUSA and EDNY's Supplemental Searches Were Adequate**

As Defendant's opening brief demonstrated, Defendant has gone above and beyond the normal FOIA search process in searching former AUSA Ariail's email account and in remedying the fact that some of Mr. Ariail's emails were likely deleted as a result of the agency's document retention policies. It ran multiples searches of Mr. Ariail's archived email, using (in the most expansive of these searches) terms that cast a wider net than those previously deemed reasonable by the Court. It determined that the U.S. Attorney's Office ("USAO") for the Eastern District of New York ("EDNY") did not open any case file for Paul Manafort or the AP meeting, and thus that there is no such file to search. It contacted Mr. Ariail himself, notwithstanding that he is no longer a federal employee. As a result of that contact, it searched for and obtained Mr. Ariail's notes from the AP meeting in question—precisely what plaintiff's FOIA request sought—and notes taken by a colleague of Mr. Ariail at a subsequent meeting at which the AP meeting was referenced, as well as responsive emails from that colleague's email account. Def.'s Mot. for Summ. J. at 6-11, 14-16, ECF No. 48 ("Def.'s Mem.").

Plaintiff challenges none of this. Rather, it claims that DOJ should conduct yet more searches of additional people's email accounts, arguing that they are leads. But in none of the remaining searches demanded by Plaintiff is it reasonably likely—as opposed to merely possible—

that responsive records would be found, so those searches are not required. *See, e.g.*, *Steinberg v. U.S. Dep't of Just.*, 23 F.3d 548, 552 (D.C. Cir. 1994) ("mere speculation that as yet uncovered documents may exist" is insufficient to challenge the adequacy of the search) (quoting *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)); *Judicial Watch, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 20 F. Supp. 3d 247, 254 (D.D.C. 2014) ("the government is not required to search everywhere [that responsive] document[s] *might* be. Instead, it is only required to search those places where [such] document[s] [are] *likely* to be").

First, Plaintiff demands that DOJ search the email archives of the two former EDNY AUSAs whose names are redacted in an April 12, 2017 email from Mr. Ariail to Andrew Weissmann, in which Mr. Ariail reported that he had "briefed to Criminal [redacted pursuant to Exemptions 6 and 7(C)]." *See* Pl.'s Mem. at 6-8; ECF No. 50-5 (Plaintiff's Exhibit 2, *i.e.* the email in question).[1] But Defendant explained in its opening brief why such a search is not reasonably likely to identify records responsive to Plaintiff's FOIA request, despite the fact that according to this email, Mr. Ariail briefed these individuals. Def.'s Mem. at 15. Specifically, the email accounts of these individuals, both former AUSAs no longer employed by DOJ, are subject to the same EOUSA email retention policy applicable to Mr. Ariail's former account, pursuant to which an algorithm automatically and permanently deletes most emails three years and thirty days from the date on which the email in question was sent or received. First Decl. of Kara Cain ¶¶ 32, 40-41, ECF No. 48-2 ("1st Cain Decl."); Second Decl. of Kara Cain ("2d Cain Decl.") ¶ 4. Thus, any hypothetical responsive emails that may have been sent or received by either of these two former AUSAs have, in

---

[1] Plaintiff mistakenly identifies the April 12, 2017 email as its Exhibit 3. *See* Pl.'s Mem. at 7, 10. Additionally, Plaintiff previously filed this same email as ECF No. 38-1. See ECF No. 50-5. Thus, references to ECF No. 38-1 in Defendant's opening brief, and in paragraph 32 of the 1st Cain Declaration, ECF No. 48-2, are to this same email.

all likelihood, been deleted pursuant to EOUSA's email retention policy. Further, were EOUSA to run the same search terms used to search Mr. Ariail's emails against the archived accounts of these individuals, such a search would likely return, for each of these AUSAs, the same several thousand *unresponsive* emails as were returned in EOUSA's prior search. *See* 1st Cain Decl. ¶¶ 28-30 (explaining that EOUSA's broadest forensic search returned in excess of 3,000 unresponsive emails, consisting almost exclusively of district-wide email blasts which appear to have been preserved because the EDNY U.S. Attorney, a "Capstone" official, was cc'd on them).

This requested search is, therefore, both futile and burdensome—and as such, well outside the boundaries of FOIA's reasonableness standard. As this Court has observed, FOIA does not require an agency to proceed with a supplemental search—including of "potential [additional] custodians"—if the agency reasonably determines at the outset that it would be "'unlikely to produce any marginal return.'" *Nat'l Student Legal Def. Network v. U.S. Dep't of Educ.*, Civ. A. No. 1:19-cv-03473 (CJN), 2022 WL 1223707, at *5 (D.D.C. Apr. 26, 2022) (Nichols, J.) (quoting *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998)); *see also, e.g., Reyes v. U.S. Env't Prot. Agency*, 991 F. Supp. 2d 20, 27 (D.D.C. 2014) ("Where . . . the Government's declarations establish that a search would be futile . . . the reasonable search required by FOIA may be no search at all.") (citation omitted); *Judicial Watch, Inc. v. U.S. Dep't of State*, Civ. A. No. 15-687 (JEB), 2021 WL 3363423, at *4 (D.D.C. Aug. 3, 2021) (upholding the agency's determination "not to further search its own records . . . given that any non-duplicative emails were unlikely to be found"); *Mobley v. CIA,* 924 F. Supp. 2d 24, 44 (D.D.C. 2013) ("[E]ven when a requester specifically asks an agency to search a particular database, the agency has no obligation to do so unless that database is likely to contain responsive materials.") (citation omitted), *aff'd*, 806 F.3d 568 (D.C. Cir. 2015). Because Defendant's declarations establish that searches of the two former AUSAs' archived email accounts are highly unlikely to

produce any responsive records at all—much less any new, non-duplicative ones that have not already been located through other custodians—the Court should reject Plaintiff's request for an order directing this supplemental search on this ground alone.

Moreover, "[c]onsistent with the need for a 'reasonable' search, the . . . burden of a potential search is also a factor in evaluating whether the search conducted was adequate," and a "time-consuming search with minimal chance of revealing responsive records may not be necessary." *Judicial Watch, Inc. v. IRS*, Civ. A. No. 13-1759 (EGS), 2015 WL 4072431, at *5 (D.D.C. July 3, 2015) (collecting cases); *see also, e.g., Dixon v. U.S. Dep't of Just.*, 279 F. Supp. 3d 1, 5-6 (D.D.C. 2017) ("Where … a FOIA request calls for an unreasonably burdensome search … the agency need not honor the request.") (citation omitted), *aff'd*, 2018 WL 4610736 (D.C. Cir. 2018); *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 866 F. Supp. 2d 28, 33 (D.D.C. 2012) (upholding the agency's determination not to search certain "archival and backup systems" where, notwithstanding the agency's maintenance of such systems, "attempting additional searches [of them] would not only be unlikely to result in additional responsive material, but would also be costly and inconvenient"). Here, were EOUSA to be required to search the two former AUSAs' archived email accounts, the most likely result would be the return—for each of these individuals—of thousands of unresponsive, district-wide email blasts. The burden that would be involved in EOUSA's processing these reasonably anticipated results, when balanced against the minimal odds that any new, non-duplicative responsive emails might be found in the haystack, is unwarranted under FOIA's reasonableness standard.

Plaintiff argues that DOJ must still search the archived email accounts of these two former AUSAs because they could have emailed a Capstone official about the AP meeting, in which case such an email would have been retained. Pl.'s Mem. at 8. But the premise of this argument, that the

former AUSAs emailed a Capstone official about the AP meeting, is pure speculation. Only U.S. Attorneys, the EOUSA Director, the EOUSA Deputy Director, and the EOUSA Chief of Staff qualify as Capstone officials under EOUSA policy, 1st Cain Decl. ¶ 38; no Capstone officials were cc'd on any of the responsive emails located through EOUSA's supplemental searches, 2d Cain Decl. ¶ 10; neither of the two former AUSAs attended the AP meeting;[2] and had either of the former AUSAs cc'd *both* a Capstone Office *and* Mr. Ariail (who did, of course, attend the meeting, and was EDNY's sole representative there) on any relevant emails pertaining to the meeting, such emails would have already been captured by EOUSA's searches. It is not reasonably likely that the two AUSAs emailed a Capstone official about the AP meeting so as to justify a search of their email accounts for such an email.

Plaintiff also argues that DOJ must search these two former AUSAs' email accounts because responsive records of Mr. Ariail were found despite the deletion of his records. Pl.'s Mem. at 7-8. But responsive records of Mr. Ariail were found not by searching his email, which turned up no responsive records, but rather through the personal contact with Mr. Ariail and the resulting searches of non-email sources. That extraordinary measure of personally contacting a former employee, which the government is not required to take in a FOIA case, was done with respect to Mr. Ariail because the Court specifically directed DOJ to search Mr. Ariail's emails and because of the email deletion issues that surfaced. *See* Tr. of Status Conference at 15:8-16:13, ECF No. 45 ("Tr."); *Blanton v. U.S. Dep't of Just.*, 182 F. Supp. 2d 81, 85 (D.D.C. 2002) ("FOIA does not impose an obligation on defendant to contact former employees to determine whether they know of the

---

[2] *See* ECF No. 26-1 Exhibit 1 (FBI memorandum, listing the attendees of the AP meeting—which, for DOJ, were Andrew Weissmann, Ann Brickley, and Mr. Ariail); ECF No. 26 ¶ 65 (Plaintiff's original Statement of Facts, averring that these three individuals were the DOJ employees present at the meeting, and citing to the FBI memorandum in support of this fact).

whereabouts of records that might be responsive to a FOIA request."), *aff'd on other grounds*, 64 F. App'x 787 (D.C. Cir. 2003); *Chilingirian v. U.S. Att'y Exec. Off.*, 71 F. App'x 571, 572 (6th Cir. 2003) ("The record shows that defendants went beyond the requirements of a reasonable search by contacting the attorneys who might know of the existence of the records, even though they were no longer employed by defendants."). The two former AUSAs, who did not attend the AP meeting and were merely "briefed" by Mr. Ariail, are not similarly situated. Nor should the Court penalize the government for voluntarily contacting Mr. Ariail by making it the new standard in this case. *Cf. Schoenman v. FBI*, Civ. A. No. 04-2202 (CKK), 2006 WL 1126813, at *19 (D.D.C. Mar. 31, 2006) (noting that "[c]ourts have refrained from accepting legal arguments that would create disincentives for agencies to take [voluntary] actions" not required by FOIA) (collecting cases).

 <u>Second</u>, Plaintiff points to an email dated May 16, 2017 (Bates No. LITG-2023-000015 0005-06), and argues that this record reveals at least one other AUSA whose email Defendant should have searched. Pl.'s Mem. at 8; *see* 2d Cain Decl. Exhibit J (the May 16, 2017 email). Plaintiff provides no argument, however, as to why this person would be reasonably likely to have records about the AP meeting, and merely argues that because DOJ personally reached out to Mr. Ariail, it should contact this AUSA. As noted above, that is not the standard. Moreover, the first redacted AUSA name on the May 16, 2017 email does indeed correspond, as Plaintiff surmises, to Mr. Ariail's former colleague whose records have already been searched and produced. 2d Cain Decl. ¶ 6. The second and third redactions are the EDNY and CRM email addresses, respectively, of an additional former AUSA, who was detailed to CRM at this time (for purposes of his filing, the "EDNY-CRM detailee") and therefore had two email addresses. *Id.* ¶ 7. Because the EDNY-CRM detailee is no longer employed by USAO-NYE, the same "3 years and 30-days" automatic deletion algorithm within USAMail also applies to all emails that he/she either sent or received from his/her USAO-

NYE email account. 1st Cain Decl. ¶¶ 40-41; 2d Cain Decl. ¶ 8. Accordingly, a search of the EDNY-CRM detailee's archived USAMail account would be both futile and burdensome for all the same reasons given above, with respect to the other two former AUSAs.

Defendant determined, however, that these record retention issues do not apply to the EDNY-CRM detailee's CRM email account, and decided—as a discretionary matter and a mitigation measure for the other record retention issues that have arisen in this case—to conduct a supplemental search of this account. Specifically, CRM searched its archives of the EDNY-CRM detailee's CRM email account, using both the same date range (March 1, 2017 through June 30, 2017), and the same search terms as the Court previously upheld as reasonable for CRM's prior email searches of other potential custodians. *See* Third Decl. of Courtney J. O'Keefe ¶¶ 11-12 ("3d O'Keefe Decl.") (explaining that the search terms used by CRM for this supplemental search were "AP" with "meeting," "Associated Press" with "meeting," "Eric Tucker," Jeff Horwitz," "Ted Bridis," "Jack Gillum," "etucker@ap.org," "jhorwitz@ap.org," or "tbridis@ap.org."); *see Judicial Watch, Inc. v. U.S. Dep't of Just.*, Civ. A. No. 1:19-cv-0879 (CJN), 2022 WL 898825, at *2, 5-6 (D.D.C. Mar. 28, 2022) (upholding as reasonable CRM's prior use of identical search terms). This search located thirteen pages of responsive email records, twelve of which consist of duplicates of records that have already produced to Plaintiff during the course of this litigation. 3d O'Keefe Decl. ¶ 20. More specifically, CRM's supplemental email search located exactly one new email that has not already been processed and produced to Plaintiff—a draft email that was prepared by the ENDY-CRM detailee on April 13, 2017, but never actually sent. 3d O'Keefe Decl. Exhibit A (new draft email appears at the top of Bates page CRM-000001).

CRM processed its largely duplicative search results, as well as the one new draft, unsent email, and on October 12, 2023 made a supplemental production to Plaintiff. *Id.* ¶ 20. On October

19, 2023, after discovering that an FBI employee's name, whose identity had previously been disclosed in the course of this litigation, had inadvertently been withheld, CRM issued a revised supplemental response and production. *Id.* ¶ 21 & Exh. A.

Third, Plaintiff argues that Defendant must also search for any additional "responsive handwritten notes" that may have been taken by other attendees of the afternoon meeting that was also held on April 11, 2017, and at which the "AP meeting" was referenced. Pl.'s Mem. at 9. Again, Plaintiff provides no reason to believe that any such other attendees took notes about the AP meeting, just the mere possibility that they did. Nonetheless, as a purely discretionary matter due to the record retention issues in this case, Defendant attempted to search for such notes.

Defendant spoke to Mr. Ariail's former colleague (the one whose notes from the afternoon meeting were located and withheld  in full), and he/she believes that (in addition to Mr. Ariail) he/she met with the following individuals, who were then employed by the Department, on the same day as the AP meeting: Bruce Ohr, Andrew Weissmann, and the same individual referred to above as the EDNY-CRM detailee. Second Decl. of Jeanette Gonzalez-Rivera ¶ 4 ("2d Gonzalez-Rivera Decl."). Mr. Ariail's former colleague has no knowledge of whether or not any of these individuals took any notes. *Id.*

In light of the possible attendance by the EDNY-CRM detailee at the afternoon meeting— as well as the fact that this individual had not previously been deemed a potential custodian of responsive records—CRM undertook a discretionary search of the EDNY-CRM detailee's paper records (as well as the EDNY-CRM detailee's CRM email account, as discussed above). 3d O'Keefe Decl. ¶¶ 14-17. Specifically, the CRM FOIA/Privacy Act ("FOIA/PA") Unit sent a search request to the Criminal Division Assistant Director of Records and Information Management and Records Manager ("CRM Records Manager"), who, in turn, sent an inquiry to the Office of the Assistant

9

Attorney General ("OAAG") records point of contact requesting any potentially responsive hard copy records.[3] *Id.* ¶ 13. The OAAG point of contact searched for the EDNY-CRM detailee's hard copy records by manually reviewing all records contained in an unclassified file cabinet, as well as all records contained in OAAG safes. *Id.* No responsive hard copy records were located as a result of this search. *Id.* Separately, the Records Manager requested that the Criminal Division Records Unit point of contact search their Records and File Tracking system, which tracks records of departed employees that have been provided to the Records Unit, for any references to hard copy records that could have been provided to the Records Unit following the Criminal Division detailee's departure. *Id.* ¶ 14. This search was conducted using the Criminal Division detailee's name. *Id.* At the time this search was conducted, no responsive hard copy records were located. *Id.* ¶¶ 13-14.[4]

Both of the other two potential afternoon meeting participants, Mr. Ohr and Mr. Weissmann, however, are well-known custodians in this case. Mr. Weissmann was an attendee at the AP meeting, and the Court previously upheld the adequacy of DOJ's search of his records. *Judicial Watch*, 2022 WL 898825, at *1-6. Nor is it reasonably likely that as an attendee at the AP meeting, he

---

[3] OAAG was the specific CRM office to which the EDNY-CRM detailee was detailed. 3d O'Keefe Decl. ¶ 13 n.2.

[4] On October 19, 2023—*i.e.*, the deadline for the instant filing—the Records Manager determined that the Criminal Division detailee's name had been inadvertently misspelled in the index list and thus, did not appear in the previous searches conducted by the Records Unit. 3d O'Keefe Decl. ¶ 15. Upon discovery of this error, the Records Manager identified through a further search of the Records and File Tracking system a box of hard copy records that contained an index list indicating that some of the records contained in the box could belong to the Criminal Division detailee. *Id.* ¶ 16. The Records Manager is in the process of retrieving the potentially responsive hard copy records located in the Records and File Tracking system, and once the records are retrieved, the FOIA/PA Unit will manually review these records. *Id.* This review will constitute the conclusion of all possible threads for the Criminal Division to follow in conducting its supplemental search of the EDNY-CRM detailee's records, and CRM will file a supplemental notice by October 24, 2023 informing the Court as to whether any responsive records were located through this final search. *Id.* ¶ 18.

would have taken notes about that meeting as it was discussed at the afternoon meeting (recall that Mr. Ariail's notes from the afternoon meeting did not include any discussion of the AP meeting that he too attended, *see* Defs.' Opening Brief at 10-11).

The Court also previously upheld the adequacy of DOJ's searches of Mr. Ohr's CRM records. *Judicial Watch*, 2022 WL 898825, at *1-6. However, Defendant determined that, at the time of both the AP and afternoon meetings, Mr. Ohr was reassigned from CRM to the Office of the Deputy Attorney General ("ODAG"), and, therefore, was an employee of ODAG, not CRM. Thus, the searches that CRM had previously conducted of Mr. Ohr's records, *see Judicial Watch*, 2022 WL 898825, at *2, would not have captured any ODAG records. Third Decl. of Jonathan M. Breyan ¶¶ 7-8 ("3d Breyan Decl.").

To remedy this oversight, OIP conducted a search of Mr. Ohr's paper and email records maintained by ODAG. *Id.* ¶¶ 9-10. Specifically, for its paper records search OIP conducted a manual review of Bruce Ohr's handwritten notes using the Records and Information Tracking Tool ("RITT") and the date range of March 1, 2017 through June 30, 2017. *Id.* ¶ 10. RITT contains records indices of documents belonging to former employees of, *inter alia*, ODAG. *Id.* After the end of a Department official's tenure with these leadership offices, his or her paper documents are indexed into the RITT database, which lists file folder titles, generally arranged according to subject. *Id.* The Office of Records Management Policy (ORMP) of the Justice Management Division (JMD) of the Department reviews these indices for accuracy and indexes the hard copy (i.e., paper) records into storage facilities. *Id.* The OIP Attorney assigned to this case reviewed the RITT indices for Bruce Ohr's ODAG records and identified a folder titled "Bruce Ohr's Notes" which was retrieved by ORMP for OIP's manual review of the paper records within that folder. *Id.* The OIP Attorney reviewed each relevant page of Bruce Ohr's handwritten notes, each page of which was dated with

11

the month, day, and year they were taken. *Id.* OIP did not locate any other folders reasonably likely to contain responsive records in this RITT indices search. *Id.*

For its email search, OIP used the same date range as was utilized by both CRM and EOUSA, and the same set of search terms as were utilized by EOUSA in its email searches in this litigation ("AP", "Associated Press", "Eric Tucker", "Jeff Horwitz", "Ted Bridis", "Jack Gillum", "etucker@ap.org", "jhorwitz@ap.org", "tbridis@ap.org" or "Manafort"), plus two additional search strings—("Associated Press" AND locker) and ("AP" AND locker)—both of which were utilized in OIP's original email searches, which the Court previously found to be adequate. *Id.* ¶ 9; *see Judicial Watch*, 2022 WL 898825, at *3, 8.

OIP's paper records search did not yield any responsive records. 3d Breyan Decl. ¶ 10. Its email search located one responsive email thread (constituting one page). *Id.* ¶ 9. OIP processed the responsive email thread, in consultation with the FBI, and on October 12, 2023 made a supplemental release to Plaintiff. *Id.* ¶ 11 & Exh. A.[5]

The sum total of these search efforts constitutes a reasonable, adequate search under the circumstances. "'[A]dequacy—not perfection—is the standard that FOIA sets,'" *DiBacco v. U.S. Army*, 795 F.3d 178, 191 (D.C. Cir. 2015), and to meet this standard an agency need only make a "reasonable[] . . . effort in light of the specific request," *id.* at 194-95 (quoting *Meeropol v. Meese*, 790

---

[5] This responsive email thread consists of a short exchange between Mr. Ohr and an FBI Special Agent ("SA") that occurred prior to the AP meeting. Mr. Ohr asks the FBI SA if "you would be available to meet with the reporters during the week of April 10," and the FBI SA responded that "I will be transitioning back to my regular duties at WFO [the FBI's Washington Field Office] soon and will be passing this project to a successor." *Id.* The FBI SA did not attend the AP meeting, *see* ECF No. 26-1 Ex. 1, and this email indicates it is not reasonably likely that he/she would have records responsive to Plaintiff's FOIA request.

F.2d 942, 956 (D.C. Cir. 1986)). Defendant is entitled to summary judgment as to the adequacy of its search.

## II. Defendant Properly Withheld Certain Information Pursuant to Exemption 5, 6, 7(C), and 7(E)

### A. EOUSA's Attorney Work-Product Privilege Assertion is Proper

Plaintiff has now withdrawn its challenge to EOUSA's Exemption 6 redactions. Pl.'s Mem. at 10. Accordingly, the only remaining issue with respect to EOUSA's withholdings is the propriety of its Exemption 5 redactions, all of which were properly made pursuant to the attorney work product privilege.

As Defendant demonstrated in its opening brief, all of its Exemption 5 withholdings are attorney work product, because the documents in question contain their attorney-authors' respective mental impressions in anticipation of litigation. First, both sets of responsive attorney notes (*i.e.*, those taken by Mr. Ariail at the AP meeting, as well as those taken by his former colleague at a separate meeting held on the afternoon the same day at which the AP meeting was referenced) contain—on their face—those attorneys' "mental impressions concerning information related to potential criminal activity received in their official capacity as federal prosecutors," as well as their thoughts on "possible [further] investigative steps" to take in response to the information they learned. 1st Cain Decl. ¶ 50. Thus, these notes are classic attorney work product, the disclosure of which would risk putting DOJ's lawyers' thought processes and investigative strategies on public display. Def.'s Mem. at 18-19. Likewise, the information withheld from a particular email is also properly protected by the attorney work product privilege, where it similarly reflects "potential investigative steps" that two DOJ attorneys who attended the AP meeting could take, 1st Cain Decl. ¶ 51—and thus was drafted with an eye toward litigation. Def.'s Mem. at 19-20.

13

In response, Plaintiff first argues that Mr. Ariail's meeting notes cannot be attorney work product because he did not confirm in his conversation with defense counsel that he took his notes with an eye toward litigation. Pl.'s Mem. at 12. As demonstrated above, the government was not even required to have had this conversation with Mr. Ariail in the first place. More importantly, this conversation occurred before Mr. Ariail's meeting notes were discovered, so there would be no reason for defense counsel to have been discussing their content with Mr. Ariail. During this conversation, Mr. Ariail simply confirmed that he attended the AP meeting, in his capacity as the former head of EDNY's organized crime and gang unit; that EDNY did not have any case file that would have been relevant to that meeting; and that he did not take any records with him when he left the government. *See* Tr. at 15:19-16:13; ECF No. 50-4 (Plaintiff's Exhibit 1) (defense counsel's email to Plaintiff's counsel, informing her of, *inter alia*, this conversation). It was Mr. Ariail's later reach-out to his former colleague that led to the discovery of his meeting notes. First Decl. of Jeanette Gonzalez-Rivera ¶ 4-8, ECF No. 48-3 ("1st Gonzalez-Rivera Decl.").

Next, Plaintiff contends that DOJ has not sufficiently demonstrated that Mr. Ariail authored his meeting notes in preparation for a specific prosecution. Pl.'s Mem. at 12. But while Plaintiff is correct that, in order to qualify for the attorney work product protection, a document must have been created "because of the prospect of litigation," *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010), "no specific claim [need be] contemplated" at the time of the document's creation, as long as it was prepared in reasonable "anticipation of foreseeable litigation," *Schiller v. Nat'l Lab. Rels. Bd.*, 964 F.2d 1205, 1208 (D.C. Cir. 1992), *abrogated on other grounds by Milner v. Dep't of the Navy*, 562 U.S. 562 (2011); *see also Heggestad v. U.S. Dep't of Just.*, 182 F. Supp. 2d 1, 8 (D.D.C. 2000) (work product doctrine applies "even without a case already docketed or where the agency is unable to identify the specific claim to which the document relates"); *A. Michael's Piano, Inc. v. Fed. Trade*

14

*Comm'n*, 18 F.3d 138, 146 (2d Cir. 1994) ("[C]ourts have taken a flexible approach in determining whether the work product doctrine is applicable, asking not whether litigation was a certainty, but whether the document was created 'with an eye toward litigation.'") (citation omitted). Thus, the fact that no prosecution was ultimately pursued out of EDNY as a result of the AP meeting does not negate the fact that Mr. Ariail was at the meeting in order to investigate "potential criminal activity" on the part of one or more specific individuals or entities, 1st Cain Decl. ¶ 50—and, thus, created his notes "because of" the potential for criminal litigation that existed at the time the notes were taken. Nor does the fact that Mr. Ariail's took notes about other meetings negate the government's showing about the meeting notes in question. *See* Pl.'s Mem. at 12-13.

Plaintiff also suggests that because Mr. Ariail was not involved in DOJ's investigation into Paul Manafort, he could not have taken his notes during the AP meeting with an eye towards litigation. Pl.'s Mem. at 13-14.[6] That is incorrect. As Plaintiff correctly notes, Defendant has previously explained that the AP meeting "occurred in the context of what was, at the time … [an] ongoing investigation into Paul Manafort," being led by the Criminal Division's Money Laundering and Asset Recovery Section ("MLARS"). Second Decl. of Courtney J. O'Keefe ¶ 12, ECF No. 30-1. However, in addition to MLARS Trail Attorney Ann Brickley, DOJ was represented at the meeting by Andrew Weissmann, then-Chief of the Criminal Division's Fraud Section, as well as Mr. Ariail, in his capacity as then-head of EDNY's organized crime and gang unit. *See supra* fn. 2; Tr. at 15:19-23.

---

[6] Defendant's prior position that it was not required to search Mr. Ariail's records was based on the fact that DOJ's FOIA regulations, which establish a decentralized system for processing FOIA requests, did not require the Criminal Division to refer Plaintiff's request to EOUSA for further processing. *See* Def.'s Reply Mem. in Supp. of Its Mot. for Summ. J. & in Opp'n to Pl.'s Cross-Mot. for Summ. J. at 5-7, ECF No. 30. It was not, as Plaintiff claims in this argument, because EDNY had no case file for Paul Manafort or the AP meeting, and there was no litigation hold on Mr. Ariail's records. *See* Pl.'s Mem. at 13.

And notwithstanding that the meeting "occurred in the context" of MLARS's investigation into Paul Manafort, numerous other individuals and entities—including Rinaht Akhmetov, Oleg Deripaska, Kypros Chrysostomides, Victor Yanukovich, Konstantin Klimnic, and numerous corporate entities—were also discussed, at least briefly, in the course of the meeting. *See* Decl. of Ramona R. Cotca, Exhibit 1, ECF 26-1 at 3-10. Thus, the AP meeting was broader than the investigation into Manafort, negating this argument.

Plaintiff also disputes the applicability of the work product privilege to the former colleague's notes, taken at an afternoon meeting held on the same day as the AP meeting at which the AP meeting was referenced. Pl.'s Mem. at 14. Plaintiff wrongly claims that Defendant failed to address this withholding. EOUSA's declaration specifically attests to the contents of these notes and explains that the attorney work product privilege applies to them for the same reasons as Mr. Ariail's notes. 1st Cain Decl. ¶ 50. Moreover, while Plaintiff further asserts that "it is doubtful that the colleague had any involvement in any anticipated litigation regarding Paul Manafort," Pl.'s Mem. at 14, this contention is a non-sequitur, where Defendant has never staked its assertion of the privilege (as to either set of attorney notes) on the Manafort investigation.

Finally, with respect to the information withheld from a particular email pursuant to the work product privilege, Plaintiff claims that "[f]ar more evidence of attorney involvement is required before a record may be deemed attorney work product" without identifying any actual shortcoming with respect to Defendant's defense of this withholding. Pl.'s Mem. at 15. As Defendant has previously explained, courts may properly award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," and that "demonstrate that the information withheld logically falls within the claimed exemption[s]," *Mil. Audit Project v. Casey*, 656

16

F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted); *see also Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715

F.3d 937, 941 (D.C. Cir. 2013) (*per curiam*) ("Ultimately, an agency's justification for invoking

a FOIA exemption is sufficient if it appears logical or plausible.") (citation omitted).

The EOUSA declaration meets these standards, with respect to both the email redaction and

the attorney notes, 1st Cain Decl. ¶ 51, and since Plaintiff does not controvert the agency's

explanation with "either contrary evidence . . . [or] evidence of agency bad faith," *Mil. Audit Project*,

656 F.2d at 738, the Court should award summary judgment in Defendant's favor as to both the

email redaction, and all of EOUSA's Exemption 5 attorney work-product withholdings.[7] *See Sorin v.*

*U.S. Dep't of Just.*, 758 F. App'x 28, 32 (2d Cir. 2018) (upholding attorney work product privilege

assertion over both "emails sent between various federal law enforcement officials concerning the

details of a then-ongoing criminal investigation and associated legal theories and litigation strategies"

and "attorney-written notes, memoranda, and drafts regarding that investigation and the associated

planned prosecutions," on the ground that all were "communications within and among federal law

enforcement agencies created in anticipation of a criminal prosecution and for the purpose of

furthering that prosecution").

### B.   CRM Properly Withheld Information under Exemption 5

In its October 19, 2023 revised supplemental production, CRM made two withholdings

under Exemption 5, both pursuant to the attorney work-product privilege. The first such

withholding is to the single new record located by CRM's supplemental search, *i.e.* the draft email

composed by the EDNY-CRM detailee on April 13, 2017, but never actually sent (the "EDNY-

---

[7] While Plaintiff's Statement of Facts cursorily avers that Plaintiff "disputes that all non-exempt and segregable information was released," Pl.'s SOF ¶ 72, ECF No. 50-1, its brief contains no such argument, nor any rebuttal to Defendant's argument that the duty to segregate does not apply to the work product doctrine. *See* Def.'s Mem. at 25.

CRM detailee draft email"). 3d O'Keefe Decl. ¶ 24 & Exhibit A (email appearing at top of Bates page CRM-000001).[8] The second is to the text of an April 11, 2023 email sent from Ann Brickley to Mr. Weissmann (the "Brickley email"), both of whom were at the time CRM attorneys. *Id.* at Bates pages CRM-000009, CRM-000011.

The legal standards for the attorney work-product privilege are set forth in Defendant's opening memorandum, *see* Def.'s Mem. at 16-18, and also above, *see supra* § II.A. This privilege apply to and protects from disclosure the ENDY-CRM detailee draft email, as well as the Brickley email. With respect to the former privilege, both emails were written by attorneys working at the time for CRM, "while conducting criminal investigations into individuals who may have violated federal criminal laws," and both "consider strategic courses of action for the Department to consider undertaking during then-ongoing law enforcement investigations." 3d O'Keefe Decl. ¶ 26. Additionally, the withheld text of the Brickly email "contains the rationale" for Ms. Brickley's "suggested path forward for the then-ongoing law enforcement investigation." *Id.* Like the attorney notes and the portion of the email withheld by EOUSA, *see supra* § II.A, these emails thus easily pass the D.C. Circuit's "because of [anticipated litigation] test," which "ask[s] whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Bagwell v. U.S. Dep't of Just.*, 588 F. Supp. 3d 58, 73 (D.D.C. 2022) (quoting *Nat'l Ass'n of Crim. Def. Laws. v. U.S. Dep't of Just. Exec. Off. for U.S. Att'ys*, 844 F.3d 246, 251 (D.C. Cir. 2016)); *see also, e.g., Dalal v. U.S. Dep't of Just.*, 643 F. Supp. 3d 33, 64 (D.D.C. 2022) (upholding assertion of attorney work-product privilege over an email exchange between federal prosecutors containing "information related to trial preparation,

[8] The draft nature of the April 13, 2017 email is evident from the fact that there is no "from" line at the top of the email. 3d O'Keefe Decl. ¶ 24 n.6.

18

trial strategy, interpretations, and personal evaluations and opinions pertinent to plaintiff's criminal case.").

CRM has also met its burden to explain why release of these emails would cause foreseeable harm to the attorney work product privilege. As the CRM declaration explains, disclosure of the information withheld pursuant to these privileges would reveal "Department attorneys' internal analyses and rationales regarding then-ongoing law enforcement investigations," 3d O'Keefe Decl. ¶ 28, including "potential deliberate steps under consideration in furtherance of then-ongoing criminal law enforcement investigations," *id.* ¶ 27. Thus, "[s]hould this information be released, it would chill the essential zone of privacy that Department attorneys rely on to offer their candid assessments of the law and facts—and strength and weaknesses—of the cases they investigate and prosecute. This chilling effect, in turn, would foreseeably harm the ability of the Department to execute on its core mission to investigate and bring to justice violations of federal criminal law, as well as the adversarial process of the U.S. justice system itself." *Id.* ¶ 28.

Thus, similar to EOUSA's attorney work-product assertion, CRM's explanation comports with the well-established recognition that the "'context and purpose'" of the attorney work product privilege within the adversarial system "makes self-evident the harm from its disclosure." *Louise Trauma Ctr. LLC v. U.S. Dep't of Homeland Sec.*, No. 1:20-CV-01128 (TNM), 2022 WL 1081097, at *6 (D.D.C. Apr. 11, 2022) (quoting *Reps. Comm. for Freedom of Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021)); *see also United States v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998) (explaining that without the reliable protection of this privilege, and attorney would have to choose between "scrimp[ing] on candor and completeness" or disclosing its "assessment of its strengths and weakness . . . to litigation adversaries"); *Machado Amadis v. U.S. Dep't of Just.*, 388 F. Supp. 3d 1, 20 (D.D.C. 2019) (finding agency's concern about potential chilling effect of disclosure of attorney work product

sufficient to show foreseeable harm), *aff'd*, 971 F.3d 364 (D.C. Cir. 2020). Because these harms would foreseeably flow from the disclosure of the emails withheld by CRM, its burden to demonstrate harm has been met.

Accordingly, the Court should uphold CRM's withholdings to the challenged email thread made pursuant to Exemption 5.

### C.   OIP, CRM, and FBI Properly Withheld Information under Exemptions 6, 7(C), and 7(E)

IOIP, CRM, and FBI also withheld certain limited information pursuant to Exemptions 6 and 7(C) to protect the privacy interests of CRM, ODAG, and FBI employees, as well as a private third party.[9] These withholdings should also be upheld.

#### 1.   OIP Properly Withheld the ODAG Email Address of Bruce Ohr under Exemption 6

Exemption 6 protects "personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(6). As explained in Defendant's opening memorandum, *see* Def.'s Mem. at 20-21, Exemption 6 requires an agency to balance the individual's right to privacy against the public's interest in disclosure. *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976). The agency must determine whether disclosure of the information threatens a protectable privacy interest; if so, the agency must weigh that privacy interest against the public interest in disclosure, if any. *See Reed v. Nat's Lab. Rels. Bd.*, 927 F.2d 1249, 1251 (D.C. Cir. 1991). The "only relevant public interest . . . to be weighed in this balance is the

---

[9] Defendant's supplemental productions were of records located by CRM and OIP in their respective above-described supplemental email searches. Because the records located by both offices implicated the equities of the FBI, both CRM and OIP conferred with FBI in processing these records, and made certain withholdings pursuant to Exemptions 6, 7(C), and 7(E) as a result of these conferrals. FBI has submitted a declaration to support the withholdings that were applied by CRM and OIP to protect FBI equities.

extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government." *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth. ("FLRA")*, 510 U.S. 487, 495 (1994) (citation omitted).

OIP properly applied these principles to withhold under Exemption 6 the former ODAG email address of Mr. Ohr. Conducting the requisite balancing analysis, OIP assessed that "[a]lthough Ohr is no longer a Department employee," the release of his former ODAG email address would "reveal details about the Department's email address naming conventions that would contribute to the ability to 'guess' the email addresses of current and future [DOJ] employees," which "would foreseeably harm current and future employees' ability to conduct Department business efficiently via email and risk an onslaught of spam or phishing emails to their inboxes." 3d Breyan Decl. ¶ 15; *see also id.* ¶ 16. Supporting this assessment, OIP emphasizes that "some Department employees have already experienced harassment and spamming when their email addresses have been guessed," thus "necessitating that the Department take remedial and security measures to allow these employees to protect their privacy so that they may effectively do their jobs—and in some instances, to protect their personal safety." *Id.* ¶ 15.

On the other side of the balancing equation, OIP determined that the release of this information "would not aid the public's understanding of how the Department carries out its duties, particularly when considering that Ohr's identity has been disclosed"—and, thus, that "there is no FOIA public interest" in disclosure of this information. *Id.* ¶ 14; *see Beck v. Dep't of Just.*, 997 F.2d 1489, 1493 (D.C. Cir. 1993) ("Information that 'reveals little or nothing about an agency's own conduct' does not further the statutory purpose; thus the public has no cognizable interest in the release of such information.") (quoting *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989)); *Shurtleff v. U.S. Env't Prot. Agency*, 991 F. Supp. 2d 1,19 (D.D.C. 2013) (holding that

21

where the identity of a government employee to whom a particular email address corresponded was

known, the additional disclosure of the email address did not serve any public interest cognizable

under FOIA); *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989)

("Something, even a modest privacy interest, outweighs nothing every time.").

Thus, because the release of this email address would further no public interest, and instead

foreseeably harm the cognizable privacy interests of current Department employees, to the

detriment of their ability to "conduct Department business efficiently," 3d Breyan Decl. ¶ 14, OIP's

withholding of this information under Exemption 6 should be upheld.

### 2.   CRM and FBI Properly Withheld Certain Information under Exemptions 6 and 7(C)

Similar to Exemption 6, Exemption 7(C) protects "records or information compiled for law

enforcement purposes" when disclosure "could reasonably be expected to constitute an

unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "Exemption 7(C), which

requires the government to prove only that disclosure 'could reasonably be expected to constitute an

unwarranted invasion of personal privacy,' is 'somewhat broader' than Exemption 6, which requires

proof of a 'clearly unwarranted invasion of personal privacy.'" *Roth v. U.S. Dep't of Just.*, 642 F.3d

1161, 1173 (D.C. Cir. 2011) (quoting *Reps. Comm. for Freedom of Press*, 489 U.S. at 756).

When an agency invokes both exemptions, courts "focus" on Exemption 7(C) because it

"establishes a lower bar for withholding material." *Nova Oculus Partners, LLC v. U.S. Sec. & Exch.

Comm'n*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) (quoting *Citizens for Responsibility & Ethics in

Washington v. U.S. Dep't of Just.*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014)); *see also Roth*, 642 F.3d at

1173 (explaining that where the relevant information "was 'compiled for law enforcement

purposes,'" thus implicating Exemption 7(C), courts "have no need to consider Exemption 6

22

separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C).") (citation omitted). However, and in any event, under both Exemption 6 and Exemption 7(C), the Court must engage in a balancing test to determine whether the public interest in disclosure is outweighed by a significant private interest in non-disclosure. *See Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 673-74 (D.C. Cir. 2016).

With respect to the threshold requirement that a record have been "compiled for law enforcement purposes," the D.C. Circuit "has long emphasized that the focus is on how and under what circumstances the requested files were compiled and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017) (citation omitted). This is not a burdensome exercise. *See Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982) (noting that in assessing whether an agency record satisfies this requirement, a court can properly accept "less exacting proof from . . . a [law enforcement] agency that the purpose underlying disputed documents is law enforcement," on the ground that where an agency has a law enforcement mission, judicial deference to the agency's characterization of its own records is appropriate); *Dalal*, 643 F. Supp. 3d at 67 (similar). Here, all of the emails in both CRM and OIP's supplemental productions were created during the course, and in furtherance, of then-ongoing criminal investigations into the activities of Paul Manafort and various other foreign nationals. 3d O'Keefe Decl. ¶ 30; Decl. of Shannon R. Hammer ¶ 10 ("Hammer Decl."). Accordingly, these records were "compiled for a law enforcement purpose" within the meaning of Exemption 7(C).

Turning to the relevant balancing test, "[o]n the privacy side of the ledger, [courts] have consistently supported nondisclosure of names or other information identifying individuals

23

appearing in law enforcement records, including *investigators*, suspects, witnesses, and

informants." *Schrecker v. U.S. Dep't of Just.,* 349 F.3d 657, 661 (D.C. Cir. 2003) (emphasis added); *see*

*also, e.g., Fischer v. U.S. Dep't of Just.,* 596 F. Supp. 2d 34, 47 (D.D.C. 2009); *Dalal*, 643 F. Supp. 3d at

69 (noting that courts "have repeatedly found that it is proper to withhold names and other

identifying information about law-enforcement officers and government officials under Exemption

7(C)") (citation omitted) (collecting cases); *Buzzfeed, Inc. v. U.S. Dep't of Just.*, No. CV 19-1977 (EGS),

2023 WL 6847008, at *12 (D.D.C. Oct. 17, 2023) (similar). Such information is "categorically

exempt" from disclosure under Exemption 7(C) in the absence of an overriding public interest in its

disclosure. *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995). And as with

Exemption 6, "the only public interest relevant for purposes of Exemption 7(C) is one that focuses

on 'the citizens' right to be informed about what their government is up to." *Passmore v. U.S. Dep't of*

*Just.,* 245 F. Supp. 3d 191, 203 (D.D.C. 2017), *aff'd*, No. 17-5083, 2017 WL 4231167 (D.C. Cir. Sept.

13, 2017) (per curiam) (quoting *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992)).

    CRM and FBI properly applied these principles to withhold under Exemption 6 and 7(C)

three categories of information in records contained within CRM and OIP's supplemental

productions: (1) the names of non-public facing CRM and FBI attorneys, an FBI SA, and an

administrative assistant; (2) the corresponding contact information, including email addresses, and

office and mobile phone numbers, of these government employees; and (3) the phone numbers for

an Associated Press journalist who attended the AP meeting.

    As both the Third O'Keefe and Hammer Declarations explain, public disclosure of such

information would put the individuals to whom this information corresponds at serious risk of

harassment and unwanted publicity, especially given the high-profile and sensitive nature of the

former Manafort prosecution and related investigations. 3d O'Keefe Decl. ¶ 34; Hammer Decl. ¶¶

15-16. With respect to the federal employees whose personal information has been protected, such inquiries or harassment could disrupt and impede CRM and FBI official activities, and/or result in unwanted or even unlawful efforts to gain additional access to these individuals and/or personal information about them. 3d O'Keefe Decl. ¶ 34; Hammer Decl. ¶¶ 16-17. *See, e.g.*, *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 192 (2d Cir. 2012) (noting that "[i]t is not uncommon for courts to recognize a privacy interest in a federal employee's work status . . . if the occupation alone could subject the employee to harassment or attack. Courts have recognized, for example, a privacy interest in the names of . . . law enforcement agents who participated in an investigation[.]"); *Walston v. U.S. Dep't of Def.*, 238 F. Supp. 3d 57, 67 (D.D.C. 2017) (employees with "sensitive occupations . . . have a cognizable privacy interest in keeping their names from being disclosed"). Likewise, CRM also properly assessed that the AP journalist whose phone number appears in the relevant records also has more than *de minimus* privacy interest in the protection of that information. *Cf. Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 822 F. Supp. 2d 12, 21 (D.D.C. 2011) (noting that "the D.C. Circuit has broadly construed the privacy interests of third parties under Exemption 6," and finding "at least a minimal privacy interest" in the identities of, *inter alia*, a journalist seeking to interview a former lobbyist while he was in federal custody) (citing *Horowitz v. Peace Corps,* 428 F.3d 271, 279 (D.C. Cir. 2005)).

In contrast, none of the personal information withheld under Exemptions 6 and 7(c) by CRM and FBI would materially advance the public's understanding of the operations or activities of either agency. 3d O'Keefe Decl. ¶ 37; Hammer Decl. ¶ 17; *see Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 30 (D.D.C. 2018) ("[I]ndividuals have a substantial privacy interest in personal information such as their telephone numbers and addresses," and "releasing the personal

information of third parties . . . does not 'contribut[e] significantly to public understanding of the operations or activities of the government.'") (quoting *FLRA*, 510 U.S. at 495).

Accordingly, the Court should uphold CRM and FBI's determination that the privacy interests at stake outweigh any public interest in disclosure in the information withheld by these agencies under Exemptions 6 and 7(C).

### 3. Disclosure of the Information Withheld Pursuant to Exemptions 6 and 7(C) Would Cause Foreseeable Harm

OIP, CRM, and FBI have also each explained how the disclosure of the personally-identifying information withheld under Exemption 6 and/or Exemption 7(C) would also cause foreseeable harm, by exposing DOJ employees (and a journalist for the AP) to harassment and/or unwanted publicity. 3d Breyan Decl. ¶¶ 15-16; 3d O'Keefe Decl. ¶¶ 34-37; Hammer Decl. ¶¶ 16-17; *see Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of State*, No. CV 19-1344 (RBW), 2022 WL 1801054, at *12-13 (D.D.C. June 2, 2022) (finding the foreseeable harm standard met for Exemption 6 withholdings, where the agency represented that disclosure of the "email username would subject him or her to 'unsolicited or harassing inquiries'") (citations omitted); *Kendrick v. FBI*, Civ. A. No. 20-cv-2900 (TNM), 2022 WL 4534627, at *6 (D.D.C. Sept. 28, 2022), *appeal filed*, No. 22-5271 (D.C. Cir. Oct. 17, 2022) (where the FBI demonstrated that "disclosure of [certain] individuals' names and identifying information would," *inter alia*, "cause invasions of privacy [and] subject them to harassment," such "predicted results of disclosure are exactly what Exemption 7(C) seeks to prevent," and foreseeable harm was demonstrated); *see also Ecological Rts. Found. v. U.S. Env't Prot. Agency*, 541 F. Supp. 3d 34, 65 (D.D.C. 2021) (explaining that because "[t]he purpose of Exemption 7(C) is to protect the privacy of individuals identified in certain agency records . . . disclosure of identifying information is a harm in and of itself. Thus, when invoking Exemption 7(C), an agency

need not establish much more than the fact of disclosure to establish foreseeable harm.") (citation

omitted); *Washington Post Co. v. Special Inspector Gen. for Afghanistan Reconstruction*, Civ. A. No. 18-cv-

2622 (ABJ), 2021 WL 4502106, at *22 (D.D.C. Sept. 30, 2021) (similar).

### 4.  FBI Properly Withheld a Special Agent's Email Address under Exemption 7(E)

Finally, FBI has properly withheld the internal email address of one Special Agent pursuant

to Exemption 7(E), which provides for the protection of information that "would disclose

techniques and procedures for law enforcement investigations or prosecutions," or would "disclose

guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be

expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).[10] As the D.C. Circuit has

recognized, "the text of [E]xemption 7(E) is much broader" than other exemptions that "set a

high[er] standard." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009). "Rather than

requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E)

only requires that the [agency] 'demonstrate[] logically how the release of [the requested] information

might create a risk of circumvention of the law." *Id.* (citation omitted). Thus, Exemption 7(E)

"exempts from disclosure information that could *increase the risks* that a law will be violated or that

past violators will escape legal consequences." *Id.* at 1193; *see also, e.g., Blackwell v. FBI*, 646 F.3d 37,

---

[10] Courts within the D.C. Circuit and elsewhere are divided as to whether the phrase "if such disclosure could reasonably be expected to risk circumvention of the law" applies only to "guidelines" or also applies to "techniques and procedures." *See Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 204 n.4 (D.C. Cir. 2014) (quoting 5 U.S.C. 552 § (b)(7)(E). Although the better-reasoned decisions recognize that the former interpretation is more consistent with the plain meaning of the statute and the history of the 1986 amendments to Exemption 7(E), the Court need not reach the issue, as in any event the "low bar" of this additional showing is met here. *See id.*; Hammer Decl. ¶¶ 18-20.

42 (D.C. Cir. 2011) (noting that Exemption 7(E)'s "circumvention" requirement is "a relatively low bar").

FBI's protection of the email address of an FBI SA in both the OIP and CRM records satisfies these standards.[11] As explained by the Hammer Declaration, disclosure of this information could enable or facilitate "cyber-attacks and other types of attacks on FBI secure communications" by providing hackers with avenues to "gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications." Hammer Decl. ¶ 21. Additionally, the publication of this information could allow bad actors to disrupt FBI's law enforcement operations by subjecting FBI employees to harassing e-mails seeking information concerning FBI investigations. *Id.*; *see also, e.g.*, *Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (affirming the withholding, under Exemption 7(E), of "protected internal e-mail addresses, non-public intranet web addresses, and a secure internal e-mail tool," because disclosure would increase risk of unauthorized access to the agency's IT system); *Dalal*, 643 F. Supp. 3d at 69-70 (upholding the withholding of, *inter alia*, internal FBI email addresses under Exemption 7(E)); *Buzzfeed*, 2023 WL 6847008, at *10 (same). Finally, as discussed *supra*, the names of most FBI SAs are protected from disclosure under FOIA. Because the majority of FBI internal e-mail addresses include at least part of the person's name, the release of the protected email address would simultaneously release the SA's name, which has been withheld for the reasons explained *supra*. *See* Hammer Decl. ¶ 21.

---

[11] For the same reasons given above, the email address also satisfies the threshold requirement of all Exemption 7 subparts by appearing in a document that was compiled for law enforcement purposes. Hammer Decl. ¶ 21.

Finally, "Exemption 7(E) by its own terms already requires that an agency show a risk of foreseeable harm," in that it requires an agency to "show some risk of circumvention before withholding material" under its auspices. *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 127-28 (D.D.C. 2021), *appeal dismissed,* No. 21-5293, 2022 WL 801357 (D.C. Cir. Mar. 15, 2022). Thus, "[u]nlike in Exemption 5 cases, no further foreseeable harm analysis is needed." *Buzzfeed, Inc. v. U.S. Dep't of Homeland Sec.,* 610 F. Supp. 3d 139, 148 n.1 (D.D.C. 2022) (citation omitted); *100Reporters v. U.S. Dep't of State,* 602 F. Supp. 3d 41, 83 (D.D.C. 2022) (same). In any event, FBI's declaration demonstrates how the disclosure of the internal email protected by Exemption 7(E) could foreseeably facilitate "cyber-attacks and other types of attacks on FBI secure communications," thus satisfying this standard. Hammer Decl. ¶ 21.

## III.   OIP, CRM, and FBI Processed and Released All Reasonably Segregable Information

CRM, OIP, and FBI have also satisfied their burden to disclose "[a]ny reasonably segregable portion" of the otherwise exempt records. 5 U.S.C. § 552(b). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). And as with other aspects of its review under FOIA, a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. U.S. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008). Here, each of the DOJ components that withheld information in the October 2023 supplemental productions conducted a careful, line-by-line review of each responsive document, and withheld information only after they concluded that there was no reasonably segregable factual or non-exempt information responsive to the request. 3d O'Keefe Decl. ¶ 40; 3d Breyan Decl. ¶ 17; Hammer Decl. ¶ 23. As there are no facts rebutting the

presumption that DOJ complied with its segregability obligations, DOJ is entitled to summary judgment on that issue.

## IV.   *In Camera* Review Is Neither Necessary nor Appropriate

Finally, the Court should deny Plaintiff's request that it review *in camera* the eight pages of emails produced to Plaintiff by EOUSA (which consisted of the duplicate emails located by the former colleague's search of her active EDNY Outlook account); the April 12, 2017 email attached to Plaintiff's memorandum as Exhibit 2, ECF No. 50-5, *see* fn. 1, *supra*; and Mr. Ariail's notes from the AP meeting. *See* Pl.'s Mem. at 10, 14.

Although a district court "may," at its discretion, "examine the contents of . . . agency records *in camera* . . . " 5 U.S.C. § 552(a)(4)(B) (italicization added), FOIA cases are typically decided on motions for summary judgment, based on the agencies' supporting affidavits, which are entitled to a presumption of good faith. *Meeropol*, 790 F.2d at 952. Thus, "[i]f the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith," then it is well-established that "summary judgment is appropriate *without in camera* review of the documents." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011) (emphasis added) (citations omitted); *see Associated Press v. U.S. Dep't of Just.*, 549 F.3d 62, 67 (2d Cir. 2008) (*in camera* review appropriate only when agency offers "vague or sweeping claims" to support withholding of responsive records). Accordingly, courts generally conduct *in camera* review only in exceptional cases. *See Nat'l Lab. Rels. Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978); *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 252-53 (D.C. Cir. 1993) (noting that *in camera* review is generally disfavored); *Elec. Priv. Info. Ctr. v. DHS*, 384 F. Supp. 2d 100, 119 (D.D.C. 2005) ("[C]ourts disfavor *in camera* inspection and it is . . . appropriate in only the exceptional case.").

Plaintiff proffers two grounds in support of its request, but neither demonstrates any "exceptional" circumstances warranting *in camera* review. First, with respect to Plaintiff's first two categories of documents, Plaintiff asserts that the Court should undertake *in camera* review because—due to Defendant's Exemption 6 withholdings—Plaintiff is unable to "determine the number or identity of additional AUSAs whose records should have been searched." Pl.'s Mem. at 10. But the Second Cain Declaration has now provided the number and identity information that Plaintiff seeks. 2d Cain Decl. ¶¶ 10-11.

Second, Plaintiff argues that the Court conduct an *in camera* review to determine "the nature" of Mr. Ariail's notes from the AP meeting. Pl.'s Mem. at 14. However, as explained, "[w]hen the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979); *see also id.* (further explaining that in the absence of a colorable demonstration of agency bad faith or misconduct, "the court need inquire no further into [the] veracity" of any agency's affidavits). For all the reasons stated above, and in Defendant's opening brief, EOUSA's declarations are sufficient for the Court to grant summary judgment as to the validity of EOUSA's Exemption 5 withholdings, including Mr. Ariail's notes.

## **CONCLUSION**

For the reasons stated above, and in Defendant's opening brief, the Court should grant summary judgment in Defendant's favor on all remaining claims and deny Plaintiff's motion for summary judgment.

Dated:  October 19, 2023                    Respectfully Submitted,

                                                            BRIAN M. BOYNTON
                                                            Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director

_/s/  Antonia Konkoly_
Antonia Konkoly
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: 202-514-2395
Email:  antonia.konkoly@usdoj.gov

_Counsel for Defendant_